Shelton v. Marshall.

SAMUEL H. SHELTON v. BENJAMIN G. MARSHALL.

We hold it to be clear and indisputable, that every State has the right to decide, for itself, all questions of its own local, internal policy, and to declare the meaning and effect of its own constitution and laws.

Whether they are in harmony with the constitution and laws of the United State, may be a different question ; that question does not arise in this case.

As respects the power of the States, over the subject of the constitutional inhibition in question, (of the introduction of slaves, for sale,) what we deem the sound and correct doctrine, was stated by Chief Justice Taney, in the case of Groves v. Slaughter, (15 Peters, 508.)

What the public and constitutional policy and law of the State of Mississippi was, and its effect upon contracts made in contravention thereof, having been settled by the decisions of its own judicial tribunals, cannot, with propriety, be considered an open question in this Court.

It is an universal principle, that a contract which is invalid by the law of the place where it is made, will be held to be invalid in all other places or countries, where it may be drawn in question.

If the present, however, was but the mere substitution of a new security, made to carry into effect the original illegal and void contract, the mere change in the form of it would not relieve it from the effect of the illegality of the original consideration ; but the new security must be held to be equally as invalid as that for which it was substituted.

When an original contract is illegal, any subsequent contract which carries it into effect is also illegal ; and whenever, in cases of this character, the subject matter of the contract can be traced back, between privies, to an original illegal contract, the substituted security is void ; and even if the parties, liable in the last security, were not privy to the illegal bargain, the same result has been held to prevail, if the true destination of such security was to secure such a bargain, made by others, for the use of him who was to reap the fruits of the bargain.

Error from Fort Bend. Tried before the Hon. Constantine W. Buckley.

Suit by Samuel H. Shelton against Benjamin G. Marshall and William Wade, on their promissory note, dated Sept. 4th, 1837, for $3,874 65, due Jan'y 1st, 1839, and payable to the

plaintiff. The defence ultimately relied on, was that in 1836, in Madison County, State of Mississippi, defendant Marshall and one John T. Boteler, both citizens of said County and State at the time, purchased in said County and State, of plaintiff, a lot of negro slaves, introduced into said State of Mississippi, for sale as merchandize ; that they not being able to pay in money for said slaves, defendant Marshall and Boteler made for the portion of the purchase money not paid in cash, their joint notes for the balance, to plaintiff, and thereupon, in pursuance of a private arrangement, made between Marshall and said Boteler, a division of said slaves took place, and to those obtained by Marshall, plaintiff made to him the usual titles, and which are hereto attached as part of this answer; that the said Boteler having utterly failed to discharge one moiety of the note or notes given to plaintiff as already stated, the payment of the whole amount devolved on defendant Marshall, although said Boteler had received one half of the slaves purchased ; and that in payment and renewal of the note or notes given as already stated, defendant Marshall executed and delivered to plaintiff the note sued on in this action, and which was given for no other or different' consideration. Defendant also states that the Constitution and laws of said State of Mississippi absolutely prohibited the introduction, at the time, of slaves for sale as merchandize ; that said sale being contrary to law, the same was void, and the note sued on invalid and void, the same being connected with and growing out of an illegal and void transaction.

Verdict and judgment for defendants. Motion for a new trial overruled.

The evidence was as follows :

Plaintiff read the note sued on, and proved the interest allowed in Mississippi. The defendants gave in evidence the Constitution of the State of Mississippi, in which the contract was made. Then they read the answers of plaintiff to interrogatories, as follows :

First : Did you or not, in 1836, or before or after that time, carry slaves to the State of Mississippi for sale as merchandize ?

Ans. I carried slaves to Mississippi in 1835, for sale, as merchandize.

Second : Did you not for some years carry on negro trading in Mississippi, by importing from other States, and exclusively ?

Ans. I did not, but merely for the year 1835.

Third : Did you not trade in slaves in Mississippi, by importing from Virginia and other States, in 1835, 1836, 1837 and 1838, either alone or in partnership ?

Ans. I never traded, neither alone nor in partnership with any one, after 1835 ; that year I traded alone.

Fourth : Did you not sell a lot of slaves, in 1835 or 1836, to defendant Benjamin G. Marshall and John T. Boteler ? If so, how many ? and for what price ?

Ans. My agent, Samuel W. Shelton, sold a lot of negroes to the defendant Marshall individually, and one John T. Boteler and Washington jointly, in 1835. I do not recollect how many nor at what price.

Fifth : Did not defendant Marshall and Boteler execute to you, as part of the transaction, their joint notes ?

Ans. I do not recollect whether the notes were executed jointly or not.

Sixth : Did you not sell defendant Marshall the slaves mentioned in the bills of sale attached to the foregoing answer ? If so, how was payment made ? (One bill of sale, dated Nov. 28th, 1835, for a slave Mary, for $1,100 ; another, dated January 9th, 1836, for two men and three women slaves, for $4,200.)

Ans. As before stated, my agent Samuel W. Shelton, sold the slaves. I presume that they are the same mentioned in the bills of sale, as I see my signature attached to them. I received a payment of $2,100, some time in 1836, I think, from Benjamin G. Marshall ; and in the year 1839, or thereabouts,

he paid about $2,000, under an execution which issued either from the State or Federal Court of Mississippi. Further particulars I do not recollect.

Seventh : Did you ever have, with Boteler or defendant, any business transaction not growing out of a sale of slaves?

Ans. I never did, that I recollect.

Eighth : Was not the note sued on given for a note, made to you by Boteler and defendant Marshall, or was it not connected with and growing out of a sale and purchase of slaves, and in 1836 or 7 ?

Ans. I do not know that the note sued on was given for a note executed to me jointly by Boteler and defendant Marshall. It was connected with and growing out of a sale to and purchase of slaves by John T. Boteler, in 1835.

Ninth : Was not the Boteler note, stated by you in your former answers as the consideration of the note sued on in this suit, given for slaves introduced as merchandize into the State of Mississippi, and sold to Boteler in 1836 or 7 ?

Ans. At this distance of time I cannot say positively that the note alluded to was executed solely by Boteler, though it is my impression that it was. It was given for slaves introduced as merchandize into the State of Mississippi, and sold to Boteler in 1835.

Tenth : When did you become acquainted with Boteler and Marshall, the defendant ? and were not all your transactions in business connected with a sale of slaves to them in 1835, 6 or 7 ?

Ans. I became acquainted with Boteler and Marshall in 1835, and all my transactions in business were connected with a sale of slaves to them in 1835. The question for which the above is intended as an answer, is so put as to induce the belief that Boteler and Marshall were joint purchasers. As before stated, my agent sold the negroes, but my impression is, that they bought separately ; though both purchashed the same year, 1835.

Eleventh : Do you not positively swear that the note sued on did not grow out of, directly or indirectly, a sale of slaves to Marshall and Boteler, or one of them, made in 1835, 6 or 7 ? If not, state what the consideration was, of the bond, note or claim for which the note sued on was given ?

Ans. I do not swear any such thing ; on the contrary, the note alluded to did grow out of a sale of slaves in 1835, made to Boteler and Washington, as I believe. Marshall, I believe, paid me for the negroes he purchased himself. Boteler not being able to pay, my lawyer in Mississippi, in 1836 or 1837, made an arrangement with Boteler, by which I became possessed of Marshall and Wade's note, now the subject of the controversy. I have been informed and believe, that Boteler sold property to Marshall for the amount of Boteler's debt to me, and that Marshall executed his note to me, with Wade as his surety, in liquidation of Boteler's debt.

As an addition to my answer to the fifth question, I will say, if Marshall executed his note at all, it was as surety of Boteler.

The answers were sworn to in September, 1848. The statement of facts stated that defendant did not read so much of the answer to the eleventh interrogatory as was contained in brackets ; but no brackets appear in the transcript. The first answers of the plaintiff, to interrogatories, referred to in the Opinion, were not offered in evidence by either party.

The defendants then introduced the deposition of John T. Boteler, who testified that Mr. Marshall and himself purchased negroes from the plaintiff in 1836 or 1837. In answer to the questions whether he did or did not, in 1835 or 6, purchase of plaintiff, in connection with either of the defendants, some slaves ; if yea, how many did you buy ; what price was to be given ; how was the purchase money to be paid ; and had the slaves bought by you been introduced by plaintiff into the State of Mississippi for sale as merchandize : witness replied, yes, I did, with Mr. Marshall ; we bought ten ; I do not re-

collect what was to be given ; I think the whole amount of the purchase money was about five thousand dollars ; each one gave his notes, with security for the payment of the purchase money ; the slaves were sold as merchandize and introduced as such into the State.

Int. 6th. Did you or not, either alone or jointly with the defendant Marshall, in payment of said slaves, execute your note or notes to plaintiff ? If so, were the note or notes lifted by you ? and if not, by whom ?

Ans. I executed my note alone, as stated above, and the negroes were transferred by me to Van Vacter and Washington, of Madison County, to secure the payment of the purchase money. The notes were renewed to them ; some payments may have been made ; what, I cannot say.

Int. 7th. Did you or not ever execute to plaintiff or sign any note to plaintiff, that was for any other consideration than slaves sold to you by him in 1835 or 6 ?

Ans. I never did.

Witness further stated, in answer to other interrogatories, that he never had but one transaction with the plaintiff ; that he went to Vicksburg to close it ; that Marshall was along.

Int. 14th. Was or was not the note, sued on, either given for slaves imported as already mentioned, or a renewal of a former note so given ? and did it not grow out of a sale and purchase of slaves introduced as aforesaid.

Ans. I think it did.

The Court charged the Jury :

That if the note, sued on, was given for slaves, introduced into the State of Mississippi, by the plaintiff, after the first of May, 1833, as merchandize, or for sale, or was given to renew a note given for such a consideration, or grew out of such consideration, it was void by the laws of Mississippi ; and if void by the laws of that State, it is void and invalid everywhere.

To which charge the plaintiff excepted.

Shelton v. Marshall.

*R. H. Howard*, for plaintiff in error, cited 2 N. & Mc. 127 ; 2 McL. 267 ; Chit. on Cont. 658 ; 4 Wash. C. C. R. 297 ; 11 Wheat. 258 ; Bird v. Appleton, 8 T. R. 562 ; Farmer v. Russel, 1 B. & P. 295 ; Exparte Balmer, 13 Ves. 313 ; Hodgson v. Temple, 5 Taunt. 181.

*J. W. Harris*, also, for plaintiff in error.

*J. B. & G. A. Jones*, for defendant in error, cited Green v. Robinson, 5 How. Miss. R. 80 ; Hope v. Evans, 4 Sm. & M. 321 ; Brien v. Williamson, 7 How. Miss. R. 14 ; Glidewell v. Hite, 5 Id. 110 ; Cowen v. Boyce, Id. 769 ; Adams v. Rowan, 8 Sm. & M. 624 ; James v. Herring, 12 Id. 336 ; Griswold v. Waddington, 16 Johns. 487 ; Collins v. McCargo, 6 Sm. & M. 128 ; Walker v. Bank of Washington, 3 How. U. S. R. 62 ; Powell v. Waters, 8 Cow. 685 ; Reed v. Smith, 9 Id. 647 ; Jackson v. Packard, 6 Wend. 415 ; Morcure v. Dermott, 13 Peters, 345 ; Torrey v. Grant, 10 Sm. & M. 89 ; Jackson v. Jones, 13 Ala. 121 ; Cotton v. Brien, 6 Rob. 115 ; Woodson v. Barrett, 2 Hen. & M.

WHEELER, J. This was a suit by plaintiff, who is appellant, upon a promissory note. The defence relied on was that it was given in the State of Mississippi, for slaves introduced into that State as merchandize, and for sale, after the 1st day of May, 1833, in violation of the Constitution of the State.— The clause of the Constitution, on which the defence rests, was adopted as an amendment, in 1832 ; and is as follows : "The introduction of slaves into this State, as merchandize, or for sale, shall be prohibited, from and after the first day of May, 1833." The effect of this provision came under consideration in the Courts of the State, in several cases ; and it was held, that it was not merely directory to the Legislature, and inoperative without legislative action ; but was, in itself, prohibitory, and operated, *per se*, a prohibition ; rendering con-

tracts, made in contravention thereof, void. (Cases cited in Brien v. Williamson, 7 How. Miss. 15–16 ; Collins v. Mc-Cargo, 6 Sm. & Marsh. 128.)

After the State Court had decided the question, it came before the Supreme Court of the United States, in the case of Groves v. Slaughter ; and a contrary opinion was maintained by a majority of the Court ; holding that the provision of the Constitution was not, *per se*, an effective prohibition ; but was simply mandatory upon the Legislature, and that legislative action was essential to carry the prohibition into effect. (15 Peters R. 449.)

The decision of the Federal Court, in the case of Groves v. Slaughter, caused the High Court of Errors and Appeals of the State, to review their own decision, and re-examine the question ; which they did in the case of Brien v. Williamson, (7 Howard Miss. R. 14.) The result was a unanimous and decided adherence to their former decisions ; from which there has been no departure ; but on the contrary, the conclusions of the Court have been reaffirmed in numerous decisions since pronounced ; and remain the settled law of the State, as firmly established as any principle of the public law of a State can be, by the uniform decisions of its highest judicial tribunals, upon questions referred to their ultimate determination. The consequence is, that it is the settled law of Mississippi, that the introduction of slaves into the State, as merchandize, and their sale, is contrary to the public and constitutional policy of that State ; and that such sale, and all contracts in contravention of the law, are void.

We hold it to be clear and indisputable, that every State has the right to decide, for itself, all questions of its own local, internal policy ; and to declare the meaning and effect of its own constitution and laws. Whether they are in harmony with the constitution and laws of the United States, may be a different question ; that question does not arise in the present case. The Courts of Mississippi had the right to determine

the effect of the State Constitution. That question, they have conclusively determined : and their determination of it is, in our judgment, conclusive upon all other Courts wherein the law of the State is drawn in question.

As respects the power of the States, over the subject of the constitutional inhibition in question, what we deem the sound and correct doctrine, was stated by Chief Justice Taney, in the case of Groves v. Slaughter. " In my judgment, (he said,) " the power over this subject is exclusively with the several " States ; and each of them has a right to decide for itself, " whether it will or will not allow persons of this description " to be brought within its limits, from another State, either for " sale or for any other purpose ; and, also, to prescribe the " manner and mode in which they may be introduced, and to " determine their condition and treatment within their respect- " ive territories ; and the action of the several States upon " this subject cannot be controlled by Congress, either by vir- " tue of its power to regulate commerce, or by virtue of any " other power conferred by the Constitution of the United " States." (15 Peters R. 508.)

What the public and constitutional policy and law of the State of Mississippi was, and its effect upon contracts made in contravention thereof, having been settled by the decisions of its own judicial tribunals, cannot, with propriety, be considered an open question in this Court. The Courts of the State had the right to determine,—they have determined that question.

If the decisions of those Courts required further support, after the research and ability by which it was maintained by Chief Justice Sharkie, in the case of Brien v. Williamson, it might be found in the decisions of the Courts of other States, in suits, where the legality of similar contracts made in the State of Mississippi was brought in question. Thus, in the case of Cotton v. Brien, (6 Robinson, 115,) the question came directly under discussion in the Supreme Court of Louisiana. And though the Court thought proper to consider the question

an open one in that Court, in view of the conflict between the then recent decisions of the State and Federal Courts, their unanimous opinion was in accordance with the opinion of the State Court. "Upon a question which concerns our own citi-"zens, (the Court said) although growing out of the constitu-"tional or legislative provisions of a sister State, when there is "a conflict between the Federal and State tribunals, as to the "just construction of such provisions, we feel authorized to look "upon the question as a new one, and to decide for ourselves." And in a clear and concise Opinion by Judge Bullard, the conclusions of the State Court in Mississippi are maintained.— The same question came before the Supreme Court of Tennessee, about the same time, in the case of Yerger v. Rains, (4 Humph. 259.) And although that Court did not treat the question as an open one; but on the contrary, considered it as being conclusively determined by the decisions of the Courts of the State of Mississippi, notwithstanding the conflict between the State and Federal Courts; yet they took occasion to express their concurrence in opinion with the State Court.

It is an universal principle, that a contract, which is invalid by the law of the place where it is made, will be held to be invalid in all other places or countries, where it may be drawn in question. The only question, therefore, is, whether the contract here in question was invalid by the laws of Mississippi, where it was made. It is insisted that it was not, because, although the present note was given in lieu of, and was substituted for, a note given for the purchase of slaves introduced into the State of Mississippi as merchandize, contrary to law, it was not given by the same person who made the purchase and gave the first note, but by a different person, the present defendant, who is not shown to have been a party to the illegal contract. It is insisted, however, that it sufficiently appears by the evidence, that a good consideration did, in fact, pass, from Boteler, the purchaser of the slaves, to Marshall, the

defendant ; but if it does not so appear, in the absence of proof to the contrary, it must be presumed that there was a good and sufficient consideration passing from the purchaser to the defendant, as the ground of his promise ; and that the latter is not affected by the illegality of the original promise, for which it was substituted. If the present, however, was but the mere substitution of a new security, made and given to carry into effect the original illegal and void contract, the mere change in the form of it would not relieve it from the effect of the illegality of the original consideration ; but the new security must be held to be equally as invalid as that for which it was substituted. How the original note came to be given up, and the present substituted in its place, does not very clearly appear. In his answer to the interrogatories first propounded, the plaintiff states, that he does not know what consideration passed from Boteler to the defendant for his assuming of the payment of the debt, which the first note was given to secure ; but in his subsequent answers he states, though not in response to any question directly to that point, that he has been informed and believes that Boteler sold property to the defendant on account of his indebtedness to the plaintiff. He does not state what property, or who was his informant ; he states that his lawyer made the arrangement by which he became possessed of the note now in suit ; but he does not undertake to give an account of the manner of the transaction. He does not recollect whether the defendant was a party to the first note, thinks he was not, or if he was, it was in the character of surety only. Boteler and defendant both bought negroes of him about the same time, but their purchases were several, and he thinks the defendant paid for those purchased by himself. The deposition of Boteler leaves the true history of the transaction, by which the present was substituted for the note originally given, in nearly the same uncertainty and doubt. It seems that Boteler was unable to pay for the negroes he purchased : and that he made a trans-

fer of them to secure the purchase money. It is evident, that the note in suit was given for the unpaid balance of the purchase money, due from Boteler ; but whether the original note was the joint note and contract of Boteler and the defendant ; and the latter was substituted in his place and took his purchase, upon his inability to make payment ; or whether some other, and what consideration passed from Boteler to the defendant for the promise of the latter, does not satisfactorily appear. The answers of the plaintiff to interrogatories tend to the conclusion that the purchases were severally and not jointly made ; and that each purchaser gave his several note ; but his recollection is so indistinct, as to particulars ; and the evidence upon the whole so unsatisfactory, as to afford but little ground for anything but conjecture, as to what was the true character of the transaction. It, however, is certain, that the original note was given for the purchase of slaves introduced and sold in violation of law ; and that it was consequently illegal and void. It was taken up and the present note given in its stead ; and no new or different consideration passed from the plaintiff. It undoubtedly is true, as his counsel insists, that, in the absence of anything appearing to the contrary, the presumption must be that the note was given upon a good and sufficient consideration. But when it is shown that the consideration of the note, for which the present is a substitute, was illegal, and that the present was made in furtherance of the original illegal contract, that presumption is repelled.

But, if we adopt the view of the case taken by the plaintiff's counsel : that is, that a good consideration did pass from Boteler to the defendant, does that relieve the contract from its original illegality, and entitle the plaintiff to recover upon it ? Several cases are cited by counsel for the plaintiff, which are supposed to maintain his right, in their view of the case. None of them, however, are precisely in point, or go quite the length, which it would be necessary to go to maintain the right of the

plaintiff in this case.   The strongest case cited for the plain-
tiff, is Farmer v. Russell, (1 Bos. and P. 296,) where the Court
of Common Pleas held, that if A receive money of B, to the
use of C, it may be recovered by C in an action for money
had and received, though the consideration on which B paid
it be illegal.   But the reporters add a query whether the case
would be varied, if A were a party to the contract between
B and C.   The decision of the case was made to rest upon
the ground that money was put into the hands of A, for the
plaintiff's use : and this money the plaintiff might recover in
the action for money had and received, without letting in any
inquiry into the illegal contract upon which it was paid.   The
case was thus put by counsel, in argument : "Suppose money
"be put into the hands of the plaintiff's clerk, for the plain-
"tiff's use, shall he be allowed to say, this money was put into
"my hands for your use, but being the consideration of an il-
"legal contract, I shall put it into my own pocket ?"   Eyre,
Chief Justice, said : "If I could be satisfied that the defend-
"ant in this case ought to be considered as insuring an illegal
"contract, I should be of opinion that the demand, necessarily
"connected with an illegal contract, and tending to facilitate
"the execution of it, would be vitiated by that contract ; but
"my doubt is, whether he can be so considered."   "It seems to
"me that the plaintiff's demand arises simply out of the circum-
"stance of money being put into the defendant's hands to be
"delivered to him.   This creates an *indebitatus*, from which
"an assumpsit in law arises, and on that an action on the case
"may be maintained."   *   *   *   *   *   "The case therefore is
"brought to this, that money is got into the hands of a person
"who was not a party to the contract, who has no pretence to
"retain it, and to whom the law could not give it by rescind-
"ing the contract.   Though the Court will not suffer a party
"to demand a sum of money in order to fulfill an illegal con-
"tract, yet there is no reason why the money in this case
"should not be recovered, notwithstanding the illegal contract

"was void." Justice Buller said the action did not arise upon the ground of the illegal contract. But the money having been paid by another to the plaintiff's use, the illegal contract was out of the question. Justice Heath was of the same opinion. He looked upon the matter in the same light as if the money had been paid into the hands of a broker, who could never be allowed to say that it was paid in on an illegal consideration. "In the case of a stake holder, the Court would "inquire into the transaction; but the distinction is, that "whether the consideration be good or bad, a man may re- "cover his own money, though not that of another person."— Justice Rooke dissented, and assigned his reasons at length.— He thought if the plaintiff had no merits, he ought not to be heard in a Court of justice, however great the demerits of the defendant might be. And Chief Justice Eyre, in conclusion, said if it were possible to mix the original transaction with the contract on which the action was brought, he agreed with his brother Rooke in all his conclusions.

It thus appears that the decision of that case was placed upon a ground, which cannot be applied, by the same reasoning, to the present case. Though the argument might be urged with much plausibility, that, if a plaintiff may recover money paid, upon an illegal contract, to a third person for his use, upon an assumpsit implied in law, he ought to be allowed to recover upon an express promise in consideration of property conveyed to him, in furtherance of such a contract. Yet the cases are not the same; and no decision has been cited, where a recovery has been adjudged in the latter case. The true principle, or ground of the decision, in the case of Farmer v. Russell, I apprehend, is that suggested by Justice Heath; that a man may recover his own money, however his title may have been originally acquired; and that when money is placed in the hands of one person for another's use, it is his money for whose use it was paid. I can perceive no other principle upon which to reconcile the cases.

"Questions upon illegal contracts, (it was said by Chief "Justice Marshall, in Armstrong v. Toler, 11 Wheat. 258, "271,) have arisen very often, both in England and in this "country; and no principle is better settled, than that no ac- "tion can be maintained on a contract, the consideration of "which is either immoral in itself, or prohibited by law. How "far this principle is to affect subsequent contracts, the direct "and immediate consideration of which is not immoral or ille- "gal, is a question of considerable intricacy, on which many "controversies have arisen, and many decisions have been "made." Several of the English cases are reviewed by the Chief Justice; and in all of them, where the plaintiff's right was maintained, it was upon the same or similar grounds to those on which the action was maintained in the case of Farmer v. Russell: that is, the payment of money upon which the new contract was founded. But in Sturs' v. Laishley, (6 Term R. 61,) where a broker, who had been concerned in stock jobbing transactions, and had paid the losses, drew a bill of exchange for the amount on the defendant, and after its acceptance, indorsed it to a person who knew of the illegal transaction on which it was drawn, the Court held, that such indorsee could not recover on the bill. Yet, Lord Kenyon said, that if the plaintiff had lent the money to the defendant to pay the differences, and had afterwards received the bill for the money so lent, he might have recovered on it. The differ- ence in principle between the case decided and that put by the Chief Justice, may not be very discernible. The distinction is supposed to be founded on the legal ground, that the money lent would constitute a new consideration, and be the founda- tion of a new contract, which could not be vitiated by a knowledge of the purpose for which the money was lent and the bill drawn. (11 Wheat. 276.) But the plaintiff doubtless paid a consideration for the indorsement to him of the bill: and it is quite as difficult to perceive any solid ground for the distinction taken in that case, as for taking a distinction be-

tween the case.of Farmer v. Russell and the present; which must be taken, if indeed the American authorities, to which we shall presently refer, as more directly in point to the present, can be reconciled, upon principle, with Farmer v. Russell and other cases to the same effect.

There are other cases cited by counsel for the plaintiff, which require notice. The case of Armstrong v. Toler, before cited, (11 Wheat. 258,) is thus put by Chief Justice Marshall: "The case supposed is, that A, during a war, contrives a plan "for importing goods on his own account from the country of "the enemy, and that goods are sent to B, by the same vessel. "A, at the request of B, becomes surety for the payment of "the duties which accrue on the goods of B, and is compelled "to pay them; can he maintain an action on the promise of "B, to return this money?" The Circuit Court had held the opinion that such an action could be sustained; and the Supreme Court affirmed the judgment. "The case (the Court "said) does not suppose A to be concerned, or in any manner "instrumental in promoting the illegal importation of B, but "to have been merely engaged himself in a similar illegal "transaction, and to have devised the plan for himself, which "B afterwards adopted. The contract with the Government "for the payment of duties, is a substantive, independent con- "tract, entirely distinct from the unlawful importation. The "consideration is not infected with the vice of the importa- "tion. If the amount of the duties be paid by A for B, it is "the payment of a debt due in good faith from B to the Gov- "ernment: and if it may not constitute the consideration of a "promise to repay it, the reason must be, that two persons who "are separately engaged in an unlawful trade, can make no "contract with each other; at any rate, no contract, which, "in any manner, respects the goods unlawfully imported by "either of them. This would be, to connect distinct and in- "dependent transactions with each other, and to infuse into "one which was perfectly fair and legal in itself, the contam-

"inating matter which infected the other. This would intro-
"duce extensive mischief into the ordinary affairs and transac-
"tions of life, not compensated by any one accompanying ad-
"vantage." The principle is illustrated by examples, showing
that where the contract is entirely disconnected with the ille-
gal act and is founded on a new consideration, it is not affect-
ed by the act, although it was known to the party to whom
the promise was made : as, if a friend should advance money
to defend against a prosecution for the illegal act, the money
would be advanced for a lawful purpose ; and a promise to
repay it would be upon a lawful consideration. (Id. 270.)
But the case does not go the length of holding, that, where
the contract grows out of and is necessarily connected with
the illegal act, and the plaintiff was a party to it, seeking to
recover a debt contracted in a violation of the law, as in the
present case, the action can be maintained. On the contrary,
it is expressly held, that, if the illegal act is the result of a
scheme between the plaintiff and defendant, or if the plaintiff
has any interest in the subject matter of it, which in that case,
was the goods illegally imported, if they were consigned to
him with his privity in order that he might protect them from
the owner, a promise to pay any advances made under such
understanding or agreement, is utterly void. And it is laid
down, that where a contract grows immediately out of, and is
connected with an illegal or immoral act ; or if the contract
be in part only connected with the illegal consideration, and
growing immediately out of it, though it be, in fact, a new
contract, a Court of justice will not lend its aid to enforce it.

In the case cited from 2nd Nott and McCord, (127,) the
plaintiff was not a party to the illegal contract. The consid-
eration of the promise upon which he recovered was a lawful
consideration, entirely distinct from the unlawful transaction
between the parties thereto. Of course an unlawful act or
contract between others, to which he was not privy, could not
affect his right to recover upon a lawful contract, made with

one or both of the parties.   In fine, the distinction which the cases cited by counsel for the plaintiff maintain, is, that where the contract was disconnected from the original, unlawful act, and was founded on a new and distinct consideration, an action might be maintained upon it, although it could not be maintained upon a contract directly arising out of the illegal act : and such seems to be the doctrine of the cases generally upon this subject.   (See 4 Burr. 2069 ; 3 Term, 418 ; 8 Id. 562 ; 3 Ves. Jun. 612 ; 13 Ves. 313 ; 5 Taunt. 521 ; 7 Id. 430 ; 4 Barnw. and Ald. 211 ; 5 Id. 335 ; Bridge v. Hubbard, 15 Mass. 92.)   It would be very difficult to maintain the right of the plaintiff, upon the authority of those cases.   The case of Bridge v. Hubbard (last above cited) is an authority clearly the other way.   A borrower of money, upon an usurious contract, took up his note and gave a new note, to which he was not a party.   It was held, that the fact, that the parties liable on the note were not privy to the usurious bargain, was not of any importance, if the true destination of the note was to secure such a bargain, made by others, for the use of him who was to reap the fruits of the bargain.   (Id. 95.)

Cases in point have been decided by the Courts in Mississippi ; whose decisions, it will be admitted, must be entitled to peculiar weight in the determination of this case.   Thus, in Coulter v. Robinson, (14 Sm. and Marsh. 18,) where A made a loan of depreciated bank notes to B, at par, and took his note for the nominal amount ; afterwards, C, being indebted to B, for a valuable consideration, agreed with him, in consideration of his indebtedness, to discharge his debt by taking up B's note to A, and substituting his own ; and he accordingly gave his note to A for the amount of B's note : and A gave up his note, and subsequently sued C upon the note thus given in lieu of B's : it was held that the taint of usury still existed in the transaction ; and A could only recover of C the actual value of the depreciated paper loaned B, without interest.— The Court said : "It is settled, that where an original con-

"tract is illegal, any subsequent contract which carries it into
" effect, is also illegal. Where the consideration of a contract
" is impeached for illegality, if the subject matter of the con-
" tract can be traced back to an original illegal contract, the
" substituted security is void. And this principle applies, if
" the parties, sought to be charged on the substituted security,
" were ignorant of the illegality of the original contract, if the
" party seeking a recovery was a privy to the original illegal
" contract." This principle, applied to the present case, would
be decisive against the right of the plaintiff to recover upon
the note in suit. The Court refer to their decision in the case
of Adams v. Roan, (8 Sm. and Marsh. 624,) as a direct author-
ity in support of the principle. In that case, the plaintiffs
were the assignees of two promissory notes, the payment of
which was secured by a mortgage of lands. The notes and
mortgage were assigned by the payee to the plaintiffs in pay-
ment for slaves, introduced into the State, as merchandize, in
contravention of law. The assignees brought suit to foreclose
the mortgage. There was no question as to the validity of
the notes assigned. Yet the Court held that the illegality of
the consideration for the assignment, deprived the plaintiffs of
all right of recovery against the maker. There, as in this
case, the note, or rather bill of exchange, originally given for
the purchase of the slaves, had been taken up ; and the notes
in suit assigned to the plaintiffs in consideration thereof. The
Court said : " But it is contended that the consideration of the
" indorsement and assignment of the notes and mortgage was
" not the purchase money of slaves, but was a consideration ex-
" tended by Runnels, to Rowan and Harris, in settlement and
" compromise, and for surceasing the suit, which Rowan and
" Harris had instituted upon the bills of exchange given for
" the purchase money of the slaves, and that they were exempt-
" ed, by this new consideration, from the fatal effects of the
" original contract, it having been cancelled by this payment.
" This latter contract was, however, equally void. It was be-

"tween the same parties and related to the first void contract,
"and its illegal consideration. It cannot be permitted that
"the parties to a contract, void by law, may evade the provi-
"sions of that law, by giving up the security originally taken,
"and substituting another in its place. It is well settled, that
"when an original contract is illegal, any subsequent contract,
"which carries it into effect, is also illegal. And, whenever,
"in cases of this character, the subject matter of the contract
"can be traced back, between privies, to an original illegal
"contract, the substituted security is void ; and even if the
"parties, liable in the last security, were not privy to the ille-
"gal bargain, the same result has been held to prevail, if the
"true destination of such security was to secure such a bar-
"gain, made by others, for the use of him who was to reap the
"fruits of the bargain." (Id. 638–9 ; and see the case of Col-
lins v. McCargo, 6 Sm. and M. 128 ; and also Cotton v. Brien,
6 Robinson, (La.) R. 115.)

It is clear, therefore, that if suit had been brought upon this
note, in the State of Mississippi, where it was made, it would
have been held that it was void by reason of the illegality of
the original consideration, and consequently no recovery could
have been had upon it. This unquestionably is the law of the
case, as settled by the Courts of the State where the contract
was made. Being the law of the contract there, it ought to
be so held here ; upon the principle before stated, that a con-
tract, which is invalid by the law of the place where it is made,
will carry with it no obligatory force elsewhere; and cannot
be enforced in the Courts of any other country. If it will not
support an action where it was made, it will not authorize a
recovery elsewhere. We therefore conclude that the plaintiff
was not entitled to recover in this action ; and consequently
that there is no error in the judgment. It is, therefore, affirmed.

Judgment affirmed.