ShackelboRD, J.,
delivered the opinion of the Court.
This suit was commenced before a Justice of the Peace, and was carried by appeal to the Circuit Court of the County of Grainger. The action is founded on a promissory note for $1.00.00; the consideration of which note was a loan in Confederate Treasury notes.
On the trial of the cause,. the Judge charged the jury in substance: “If the plaintiff in error, borrowed Confederate Treasury notes, knowing at the time what he was getting, he would be liable for the value, and the defendant, in error, was entitled to recover to that extent.” A verdict and judgment was rendered for the defendant in error. A new trial was moved for, and overruled; and an appeal taken to this Court.
The question presented for our consideration, is: Are Confederate Treasury Notes a legal consideration, and such as can be enforced in a Court? For the proper solution of this question, it becomes necessary to examine into the history, object, and purposes for which these notes were issued. The Court will take notice of the attempts of this State, with the other Southern States, to withdraw from, the Federal Union, and to throw off the allegiance of the citizens of the several States of the United States, and it is a. part of the history of the country. A confederation of States was formed, and a Government organized; that large armies were placed in the field, in hostility to the Government of the United States; that these notes '1 were issued under the authority of that Government, and put into circulation as the representative mfohef,'" *160 as a substitute for it, to perform its functions, by becoming the medium of circulation, and were issued in denominations of from $5 to $1,000, and were in the following form:
“Six months after the ratification of peace between the Confederate States and the United States, the Confederate States of America will pay - dollars, to the bearer, on demand. Dated Richmond, Va., 1862.”
The 10th section of article 1st, of the Constitution of the United States, provides, “no State shall enter into any alliance or confederation, coin money, or emit bills of credit,” etc., etc.
The notes, on their face, purport to have been issued by a confederation of States, in direct violation of the Constitution of the United States; they are of the nature and character of bills of credit, as defined by the Supreme Court of the United States, in the case of Craig vs. The State of Missouri, 4 Peters, 410, and Briscoe vs. The Bank of Kentucky, 11 Peters, 257, in which cases the Court defined “bills of credit,” to be, paper issued by authority of a State, and designed to circulate as money, and were within the prohibition of the Constitution. The Constitution of the United States was framed by men who were familiar with the facts and causes that led to its adoption. The government of the old Confederation was formed during the period of the Revolution, and grew, out of the exigencies of the times. . It was designed to protect the people against the common enemy. All reflecting men saw the evils attending such an Union; that it was wholly insufficient to promote peace and security, and *161 provide for the general welfare. To avoid the evils patent to every observing mind, the statesmen and patriots of that day, formed the present Constitution. The reasons that led to it, cannot be more forcibly expressed, than in the preamble to that instrument: “We, the people of the United States, in order to form a more perfect union, establish domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and posterity, do ordain and establish this as the Constitution.” Language cannot he more impressive or stronger. This was the act of the whole people, and in its adoption, it became the charter of their liberties, and the permanent law of the land. Any law or act done by the people, or a- State, in violation of it, is absolutely null and void.
They were expressly prohibited from entering into any alliance or confederation. The framers of the instrument knew the evils of such alliances, or confederations. To permit it, would end in the destruction of the Government, and it was sedulously guarded against. We have seen and felt the terrible consequences growing out of a violation of this provision of the Constitution. The issuance of these Confederate Treasury Motes was the act of this confederation of States. They were issued for an unlawful and illegal purpose — that of levying war against the Government, and in violation of the Constitution; and are therefore, treasonable, illegal, and utterly void. It is insisted, the illegality of these notes consisted in putting them into circulation by an illegal organization for an illegal purpose; that the act *162 of forcing them, under the “stress of legislation and arms, could not be resisted at the time; that the act of using them, for innocent and lawful purposes, are acts that do not fall under the same rule of law; that the principle, if they were issued for an unlawful pirrpose, should not apply when they passed into the hands of persons who had no agency in putting them into circulation. And, in support of this position, Story on Conflict of Laws, is cited, secs. 248-9.
The principle of illegal contracts, is, after the illegal act is done, if the new contract is wholly unconnected with the illegal act, and is founded on a new consideration, and is not a part of the original scheme, although it may he known to the party with whom the contract is made, it will make no difference that such new and independent contracts are made with the person who is the contractor or conductor of the original illegal act, if it is wholly disconnected therefrom; for a new contract, founded on a new consideration, although in relation to property, in respect to which there has been prior unlawful transactions between the parties, is not, in itself, unlawful.” We admit the principle as correct, but it is not applicable to the case under consideration.
The principle stated by the learned jurist, applies to those cases where the contract relative to property was made in contravention of the same rule of law, and the property, passing into the hands of third parties, was not affected by the original illegal transaction. In the case of Armstrong vs. Tola, 11 Wheaton, 258, cited by the defendant, the same principle was recognized. The Court say: “No action lies on any contract, the consid *163 eration of which, is either wicked in itself or prohibited by law; but, if the illegality is not' the consideration of the contract, and it is entirely disconnected from it, the contract is valid, though the occasion for making it arose out of the illegal act.” ‘The ■ same principle was recognized, by this Court, in' the case of the Ohio Insurance Company vs. The Merchant’s Insurance Company, in 11 Humphrey’s, 16. In the case under consideration, the illegality consisted, not only in issuing and putting into circulation, a currency, the object of which was to aid the enemies of the Government, but every individual into whose hands the note passed'} knew the object and purposes for which they were issued. By receiving them as a circulating medium, and in passing them he was doing an illegal act, and to that extent gave aid and comfort to the enemies of the Grovernment, and was not disconnected with the original purpose of issuing them. The note in suit is founded upon this illegal consideration. The defendant knew the purposes for which these Confederate Treasury Notes had been issued; and the consideration of this note, is, therefore, illegal and utterly void.
The case of Orchard vs. Hughes, 1 Wallace, 73, is cited and relied uppn by the defendant in error, as an authority controlling the principles in this case. In that case, Orchard borrowed of Hughes a sum of money, consisting of the bills of the Bank of Tekama, of the Territory of Nebraska. This Bank, though chartered by the Legislature of that Territory, had never been approved by Congress. Orchard executed *164 a mortgage to secure the payment. At maturity, he failed to pay the money, and suit was instituted to foreclose the mortgage. It appeared, the notes were current and in circulation at the time they were received by him — that he had paid a portion of them to some of his creditors, and the balance had proved worthless in his hands. There is no proof showing that Hughes was any way connected with the Bank. There was a decree against Orchard, of foreclosure, and an appeal to' the-Supreme Court. Mr. Justice Nelson, who delivered the opinion of the Court, says: “Admitting every allegation against the legality of the Bank charter, the worthlessness of the paper issued by the Bank, Orchard, the maker of the note, has not been the sufferer. The bills constituting a portion of the consideration .of the note, he used, in payment of his debts, while they were current in the community, and he has not taken them back either, voluntarily, assuming that he might have done so, and set up the fact as a defense to the note; nor has he been subjected to the re-payment of the debts he discharged, by the use of them; and even were he permitted to succeed in reducing the present demand, by rebutting the Bank bills recieved by him, it does not appear that he is under any obligation to account for that amount to the creditor or creditors, to whom he paid them. The defendant, therefore, is not in a condition to contest the several questions, raised and discussed in the argument, in respect to the power of the Legislature to charter the Bank, or the conduct of the parties concerned in its organization.”
*165 The judgment of the Circuit Court below, was affirmed. There is a clear and broad distinction, between the issuing of Bank notes, without the sanction of a charter, which passes as currency in a community, and a currency that has been issued for an illegal and treasonable purpose. The parties who issued the Bank notes, could not have recovered, according to well-settled principles, on a note, the consideration of which were the illegal notes of their Bank. They would have been repelled from a Court, in attempting to -enforce an illegal contract; but the notes passing into the hands of third persons, no way connected with the illegal transaction, were not effected by it. In the case of Confederate Treasury Rotes, every' one, into whose hands soever they passed, knew the objects and purposes for which they were issued, and was guilty of an illegal act in passing or giving them currency.
It is insisted, that, although this note, under the Constitution and laws of the United States, was void, that it was made within the limits of the Confederate Government, and while they-had the occupation of the country; that they had organized a Government, that it was a de facto Government, and, therefore, they had the legal right to issue these Treasury notes. It is insisted, in support of this principle, that the Supreme Court of the United States, in the late case of the Hiawatha and Amy Warwick, have held, that the late rebellion was a civil war, and that those engaged in it, were entitled to belligerent rights; that that was such a recognition of the revolted States, as would constitute them a government de facto.
*166 That the revolted States organized a Government over them — for a time closed the courts established by the regular Government — placed large armies in the field, in hostility to that government, and held, for more than three years, a large portion of the territory, over which they claimed to exercise jurisdiction — the final disruption of that government — the suppression of the rebellion — the re-establishment of the jurisdiction of the Government of the United States — are matters of history, of which this Court will take judicial notice. The principal question before the Court, in this case of the Hiawatha and Amy Warwick, was, whether the property of persons domiciled and residing within the revolted States, was properly the subject of capture, on the seas, as enemy’s property? The Court say, quoting from Vattel: “A civil war breaks the bands of society and Government, or, at least, suspends their force and effect; it produces in a nation two independent parties, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must, necessarily, be considered as constituting, for a time, two separate bodies, two distinct societies, and having no common superior to judge between them. They stand precisely in the same predicament, as two nations who engage in a contest, and have recourse to arms. This being the case, it is very evident, the common law of war, those maxims of moderation, humanity, and honor, ought to be observed by both parties, in every civil war.”
When parties in rebellion, occupy and hold, in a hostile manner, a certain portion of territory — have *167 cast off their allegiance, and declared their independence — have organized armies — have commenced hostilities against their former sovereign — the world acknowledges them as belligerents, and the contest, a war. Hence, the parties to a civil war, ■ usually acknowledge to each other, belligerent rights; that is, they exchange prisoners and adopt the other courtesies and rules common to national■ and public wars. The Court say: “It is not the less a civil war, with the belligerent parties in hostile array, because it may be called an insurrection by one side, and the insurgents ■ be considered as rebels and traitors.” It is not necessary that the independence of the revolted States *be acknowledged, to constitute a belligerent power: Wheaton’s Lawrence, Suppliment, 17.
The revolted States were recognized by the Government of England as a belligerent power, on the 13th of May, 1861. As soon as the news of the attack on Port Sumpter, with the information that the insurgents had an organized Government, was received, most of the other nations of Europe followed the course of the Government of England in recognizing them as having belligerent rights. The proclamation of the President and the Acts of Congress recognized a state of war. The exchange of prisoners, and the other usages of war between the opposing armies, was a recognition on the part of the Government of the United, States.that a war existed, and should be conducted on principles of humanity, and according to the custom of civilized nations; and thus far, the political power of the Government accorded to the insur *168 gents belligerent rights. This did not carry with it all those rights that existed between two independent nations at war. In civil wars, Yattel says: “They usually award to each other belligerent rights; that is, they exchange prisoners, and adopt the courtesies and rules common to national and public wars.”
In its prosecution, after this recognition on the part of the Government, the vessels, (the subject of contro-vesy in the case before the Supreme Court of the United States,) were captured. The Court say: “The question whether the Confederate States are a belligerent power, was one purely political; that they must be governed by the decisions and acts of that -department of the Government to which this power is entrusted. The according of belligerent rights to the insurgents did not constitute them a Government de fado; nor vested in them none of the rights of sovereignty which would authorize them to issue a currency that can be recognized as legal by the Courts sitting under the authority of the regular Government; nor can the Courts recognize any of the acts of the iusurgents, in their organization as a civil government.
This question rests with the political power of the Government. So long as that power withholds its recognition, the Courts of the country cannot lend their aid to enforce any contract growing out of the organization of the so-called Confederate States. Wheaton, in his International Law, says: “Until the new State is acknowledged, either by the foreign State where its sovereignty is called in question, or by the Government of the country of which it was before a province, *169 courts of justice and private individuals are bound to consider the ancient state of things as remaining unaltered:” Lawrence’s Wheaton, 407.
This principle is held in the case of Kenneth vs. Chambers, 14 Howard, 88; Lawrence’s Wheaton, 48, and the authorities cited.
In the case of the City of Bemer vs. the Bank of England, 9 Vesey, 347, it was held that a judicial court cannot take notice of the foreign Government not acknowledged by the Government in which the Court sits. This question came before this Court at the December Term, 1865, at Nashville, in the case of O. B. Wright and Wesley Cantrell vs. Overall, (manuscript opinion.) The Court say: “This question involves considerations that do not belong to the Courts of the country. It involves the determination of great political questions, which belong to the departments of the Government that have charge of our political relations, (the legislative and executive,) and when decided, the Courts follow their decisions; and until these departments have recognized the existence of a new Government, the Courts of the nation cannot. The case was well considered.” We are satisfied with the decision. It is fully sustained by authority: 4 Crouch, 241; 3 Wheaton, 324; 7 Wheaton, 325; 7 Howard, 1; 14 Howard, 88.
The political power of the Government of the United States, from the organization of the Government of. the so-called Confederate States, to its final overthrow, refused to acknowledge its existence. The Government of Europe, acting upon a principle of in *170 ternational law, witbbeld their recognition of it as an independent nation. Lord Russell, the English Minister, in reply to a note of Mr. Mason, the Commissioner of the Confederate States, says: “ You state that the Confederacy has a population of 12,000,000 — that it has found itself capable, for eighteen months, of successful defense against every attempt to subdue or destroy it; that, in the judgment of the intelligence of all Europe, the separation is final; that, under no possible circumstances, can the late Federal Union be restored. On the other hand, the' Secretary of State of the United States, has affirmed, in an official dispatch, that a large portion of the once disaffected population has been restored to the Union, and now evinces its loyalty and firm adherence to the Government; that the white population now in insurrection, is under 5,000,000; that the Southern Confederacy owes its main strength to the hope of assistance from Europe. In the face of the fluctuating events of the war, the alternations of victories and defeats, the Capture of New Orleans, the advance of the Federáis to Corinth, to Memphis and the banks of the Mississippi as far as Vicksburg, contrasted, on the other hand, with the failure of the attack on Charleston, and the retreat before Richmond, her Majesty’s Government is still determined to wait. In order to be entitled to a place .among the nations of the earth, a State ought to have, not only strength and resources, for a time, but afford promises of stability and permanence. Should the Confederate States of America win that place among other nations, it might be right for other nations to *171 acknowledge an independence, achieved by victory, and maintained by a successful resistance to all attempts to overthrow it. That time, however, has not, in the judgment of her Majesty’s Government, arrived.” .
The same policy was continued by the Governments of Europe, until finally, in 1865, the organization, (the acts of which we are now urged to recognize as a Government de facto,) sunk_ beneath the ruins of the Confederacy, crimsoned with the best blood of the nation, leaving a land desolated,- private _ fortunes wrecked, thousands of widows and orphans turned houseless and penniless upon the world, her chief in prison, her leaders in exile, and a country in ruins; a sad, but truthful lesson, of the consequences resulting from a violation of the Constitution- of our country., and of the instability of all human affairs.
It is urged, that it is against sound public policy, to repudiate the private transactions of citizens for years, as unfit for legal redress, to their great injury and pecuniary ruin; and, it is insisted, that the people residing within the limits of the late rebellion, have the right to ask from the Government, that their private contracts, made and entered into while the rebel Government was over them, be enforced. This is a question over which the Courts have no control.
It is our duty to declare the law as it exists — we have no power to alter or change it. If the contracts were made in violation of positive rules of law, it is the duty of the Courts to repel the. parties, and refuse its aid. The maxim, “ ex turpi• causa non *172 oritur actio” is a principle of the common law, and has been acted upon from the earliest period of English jurisprudence.
The consideration of this note being Confederate Treasury Notes, issued in violation of the highest law of the land, and for the purpose of levying war against the Grovernment, is illegal and void. It is against sound policy for the Courts of the country to lend their active aid to enforce such contracts; no principle of the law is more clearly settled in the English and American jurisprudence.
The common law prohibits everything that is unjust, illegal or “ contra bonos mores.” The object is to suppress vice, and promote the general welfare of society.
The principle of public policy is this, “ ex dolo malo non oritur actio.” No Court will lend its aid to enforce a contract, while it is founded on an immoral or illegal act: Chitty on Con., 657; 4 Pickering, 314; 14 Mass., 322; 5 Johnson, 327; 4 Hump., 199, 132, 259; 5 Hump., 108; 6 Hump., 227; 1 Meigs, 431; 2 Hump, 131; 3 Head., 297, 319, 723.
This Court held at the last term at Nashville, (manuscript opinion; case of Wright and Cantrell vs. Overall,) the Court would not lend its active aid to enforce an executory contract, the consideration of which was Confederate Treasury Notes. Also, in a case decided at Jackson, (manuscript opinion,) where the contract, (the basis of which was Confederate Treasury Notes,) had been executed, and the rights of the parties *173 voluntarily settled, for the quiet and repose of society, the Court would not disturb it. The charge of His Honor, being in conflict with this opinion, was error.
The judgment will be reversed, and the cause remanded.