In re CANFIELD..

(District Court, S. D. New York. July 5, 1911.)

1. EVIDENCE (§ 437*)—PAROL EVIDENCE—VARYING WRITTEN INSTRUMENTS—ILLEGALITY.

Where the entire agreement of the parties has been reduced to writing, parol evidence is inadmissible, and the court can only enforce the written stipulations, but parol evidence is admissible to show that the obligations contemplated by a written contract involve acts forbidden by law, though the writing expressly provides that nothing but the writing shall be considered.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2025–2029; Dec. Dig. § 437.*]

2. CONTRACTS (§ 140*)—VALIDITY—ILLEGAL CONTRACTS.

Where the parties to a contract reduced to writing stipulating that nothing but the writing shall be considered, made an illegal contract outside of the writing, the original contract is void, and with it must follow the written agreement, whether regarded as a part of the total engagements between the parties, or as an independent contract made in performance of the prior oral contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 713–721; Dec. Dig. § 140.*]

3. CONTRACTS (§ 138*)—ILLEGAL CONTRACTS—ESTOPPEL.

A party to an illegal contract cannot be estopped from setting up the illegality, and this is especially true where the contract violates a statute designed to relieve the party from some supposed oppression.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

4. USURY (§ 53*)—USURIOUS TRANSACTIONS.

A lender of $10,000 at 6 per cent. had as a part of the transaction borrowed the funds at 5 per cent. He obtained collateral security for the loan, but the collateral was troublesome. He received as a part of the transaction an additional $1,200 per year for nominal work of notifying delinquent debtors of the borrower on their claims delivered as collateral. Held, that the transaction was usurious under the statute of New York.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 91, 114–118; Dec. Dig. § 53.*]

5. USURY (§ 113*)—BURDEN OF PROOF—EVIDENCE.

A party relying on the defense of usury has the burden of proving it by a preponderance of the evidence, and the court in determining the sufficiency of the evidence must act cautiously.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 308–323; Dec. Dig. § 113.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CONSTITUTIONAL LAW (§ 70*)—JUDICIAL POWERS—ENCROACHMENT ON LEGISLATURE.

Whether the usury law is too drastic, or is economically unwise, is no concern of the courts, which are bound to enforce it as written.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–132, 137; Dec. Dig. § 70.*]

In the matter of the bankruptcy of Abram L. Canfield. Proceedings on the claim of one Burden. Report of master denying relief confirmed.

Brush & Crawford, for petitioner.

Engel Bros., for receiver.

HAND, District Judge. The first question is of the admissibility of oral testimony to contradict the written instrument. It would seem hardly necessary to show that the parties may not avoid the positive command of the sovereign by resorting to so easy a cover as reducing their agreement to writing. Wigmore, § 2414. However, the case in Barbour is to the contrary, and there are other cases looking in the same direction. I regard Scott v. Lloyd, 9 Pet. 418, 446, 9 L. Ed. 178, as controlling, because in that case although the bargain took the form of the sale of an annuity charged on land, the court charged the jury that they might consider all the circumstances including matter in pais contradicting the deeds. This part of the charge the Supreme Court sustained after full discussion. So far as the case in Barbour itself goes, it is at least overruled by Mudgett v. Goler, 18 Hun. (N. Y.) 302. Nothing is more common than for courts to disregard the form of the transaction and find whether it is only a cover for violation of the statute; the books are full of the unravelling of all sorts of ingenuities, which involve the contradiction of what the parties have written. Mercantile Trust Co. v. Gimbernat, 134 App. Div. 410, 119 N. Y. Supp. 103. Upon principle there can be no doubt.

[1] The parol evidence rule means only this: That where the parties have in any form said that a writing shall completely embody their engagements, the court can enforce none but the written stipulations without disregarding the very contract they have made. Wigmore, §§ 2429, 2430. When, however, the inquiry is whether the performance of the obligations contemplated involves acts which are forbidden by law, the parties have no power to determine the scope of that inquiry.

[2] Even if the writing expressly agreed that nothing but itself should be considered, the inquiry would still be whether, notwithstanding that written stipulation, they had made an illegal contract dehors the writing. If so, that original contract is void, and with it must fall the written agreement, whether the latter be regarded as a part of the total engagements between the parties, or as an independent contract made in performance of the prior oral contract.

[3] Nor can there be any estoppel against setting up the illegality of an agreement; that would be to evade the very purpose of the law in forbidding men to make it. It would be peculiarly improper in the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

case as here of a statute designed to relieve the weaker party from some supposed oppression. Surely every one must see that when the law relieves such an one from the consequences of his weaker position in the bargain, he may not be successfully tied up at the very time of his weakness from subsequently claiming protection.

[4] On the merits I agree with the master. It is, of course, possible by consistent hostility not to enforce any statute of which one disapproves the purpose. Nothing short of such a determination can, I think, cover up the actual tenor of this transaction; and, if so, I have no right to relieve the lender, because the penalty is greater than I might wish, or even if the offense should seem to me to be no offense at all To that particular kind of judicial usurpation I will not yield. What then are the facts? The lender borrows all his funds at 5 per cent. and lends them upon a troublesome collateral at 6 per cent. By that he gets $100 per year and accepts a risk of $10,000. So far there is small inducement by way of profit. However, he does get in addition $1,200 per year, making a net profit of $1,300 on his loan. That he explains was no more than fair return for the work required of him as obligee under the guaranty bond; work which was undeniably substantial and vexatious. The question resolves itself into a consideration of whether $1,200 per year was clearly too much to pay for the work. What, then, was it, and how did he calculate its worth? He says that he knew that the accounts would average about $100 each, and that there would be therefore always 100 of them outstanding. His substantial duties in regard to each were these: (a) To notify the debtor whenever remittance to him from Canfield on any account was twenty days in default, (b) To examine the books and vouchers of Canfield monthly and to compare the statements rendered by Canfield to him with the books of original entry. The work of comparison Burden says that he estimated would take five or six days every month, while the letters to overdue debtors would be an added labor. However, all the comparison required upon 98 accounts he said he in fact did in one day. It is of course possible that his provisional estimates were honestly so far wrong as that, but, since he was himself a bookkeeper, it is unlikely. It is also true that he made two other examinations in January, but these were for substituted accounts, and there appears no reason to suppose that the parties originally contemplated substituted accounts or any other examination than the monthly one required in the bond. That being so, certainly Burden much miscalculated the labor involved in doing what was required. The labor of notifying delinquent debtors was necessarily uncertain, but if every debtor failed to pay—a ridiculous assumption—it would not have equalled the difference between the pay for a day's work and the monthly interest rate. Indeed the accounts assigned apparently were only due in four months. There is just ground then for believing on Burden's own testimony alone that he hardly regarded the services mentioned as equal to the pay reserved.

Moreover, the whole situation was most extraordinary. Why should Burden at the outset have sought a place at $50 per week with light work as an accessory to a loan of $10,000? It is perhaps not incred-

ible, but it is certainly most unusual. Why thereafter should he lend money that he did not have for the sake of $100, and, again as an accessory, perform incidental services to secure the principal, which were worth $1,200? If he had been in search of employment, he might have thought to get it in this way for its own sake, but he advertised himself as a retired merchant with money to lend. If he honestly believed what he now says he was an extraordinary man; but if he saw a chance by borrowing to lend out at 18 per cent. he was a usual man. If, moreover, he looked about with his broker for ingenious fetches to elude the drastic usury law of New York, he found one which under the circumstances had an apparent plausibility that was most promising. All the antecedent probability is therefore with the receiver and against the claimant.

Nevertheless suspicion is not enough, for the result is harsh. The added proof comes from the direct testimony. Canfield and Hess each swear squarely that the whole matter was a cover for usury; Koehler and Burden squarely contradict them. Burden has $10,000 to lose; Koehler must naturally see his customer through if he has embarked him in the difficulties and has suggested the device to him. Each of these has a strong personal bias to tell the story as they tell it. Canfield has his own proper bias as well, though not so direct as Burden's. If he should get his discharge, it is quite true that he would have no pecuniary interest in how the estate was divided between his creditors; still I think it not fanciful to assume that he has a reasonable motive to make the dividend to his general creditors as large as possible. If, on the other hand, his discharge be refused, he has an obvious motive now to tell a story which may protect him from successful suit hereafter upon this indebtedness. Furthermore the same story would serve to defeat objection to his discharge if that came from Burden himself, for it would show that he had no provable debt. Now, I think that there is already in the case enough proof to show that Canfield may have some ground to fear for his discharge, without of course meaning to suggest any opinion upon that subject. While, therefore, it is undoubtedly true that of the two Burden is more directly concerned in the outcome since he has his money directly staked on the result, I cannot still regard Canfield as a disinterested person. The same is not true of Herzog's testimony, for I can see no motive which she can have in telling what is not true. She is now married and presumptively not dependent upon Canfield for employment, nor is it indeed apparent that he is in a position to give her future employment, were she not. The question raised of her presence at the interview is largely verbal, for with such partitions with open windows in them giving right into Canfield's room, and especially with the door left open, there is no reason to doubt that she was in a position to hear, as she swears she was.

[5] However, were the case one merely of word against word, I should perhaps feel that the receiver had not carried the burden of proof which the defense puts upon him. The antecedent probability of Canfield's story, and the improbability of Burden's, supply a corroboration which turns the scale. It is not essential that I should lay

every reasonable doubt, as though Burden were being tried for the crime of usury, but the preponderance of the proof is all that is required. Just what is meant by the proviso found in the books that the proof must be clear and convincing is not apparent, except it be that a court should be cautious. However, indecision, or hostility, is not caution, and here a determination for Burden can proceed only from one or the other.

[6] Finally a word about the supposed equities of the situation. Whether or not the statute against usury is too drastic, or is unwise economically, is in the first place no business of the courts, nor have they any right, even if they have the power, indirectly to substitute their own beliefs for those of the Legislature, no matter which of the two be right. Here, however, there is not even the supposed room for such spurious considerations which at times prove potent in actual decisions, because the law of usury is many decades old upon the New York statute books, and every one knows what chances he takes when he disobeys it. If my inference is right upon the facts, Burden deserves not the slightest sympathy. He has invented a very ingenious and plausible device to evade the law, one of those manifold expressions of the pressure which economic necessity exerts in this matter to circumvent the popular will. When he did it, at the suggestion of his broker, he showed clearly enough that he was quite alive to what he was about, and to the risks he was taking. The play has gone against him, and he has no ground of complaint whatever. Therefore, the whole question is one of fact, to be regarded without the least color of sympathy or prejudice. If he did honestly make such a contract for so little profit, overweighted as it was with an incident of so much more consequence than the main motive itself, he is like any other creditor; if he was only one more money lender, who will take the risk of forfeiture under the usury laws, in the hopes that he will not be caught, he has himself to blame for disregarding the will of the community in which he lives. I can have no doubt of the facts, and the report will be confirmed.