## OLDHAM v. BRILEY.

### No. 1812.

Court of Civil Appeals of Texas. Eastland.

June 10, 1938.

Rehearing Denied July 8, 1938.

Woodward & Coffee, of Big Spring, for appellant.

Wilson, Randal & Kilpatrick, of Lubbock, for appellee.

GRISSOM, Justice.

In October, 1933, the Citizens National Bank of Abilene entered into a contract with W. G. Briley and another whereby they became agents of said bank for the sale of 2,624 acres of land owned by the bank. The contract provided, in substance, that the bank was to receive $26,240 from the sale of the land, and that the agents were to receive all amounts collected from the purchasers above that sum. It provided that upon a sale of a portion of the land the purchaser would make application for a loan to the extent of, at least, $10 per acre. It provided in the event the total amount of loans procured by the purchasers and paid into the bank did not amount to as much as $26,240, then second lien notes would be held by the bank until such amount was collected by the bank, and when said amount was collected by the bank the remaining second lien notes would be transferred to said agents as their compensation. It provided further for crop mortgages to be executed by purchasers to secure payment of second lien notes.

In November, the bank entered into a contract to sell A. E. Cozart a section of land, out of the 2,624 acre tract. The purchase price was $9,600, $1,500 cash, the receipt of which was acknowledged, and the agreement of Cozart to execute ten vendor's lien notes for $710 each. Cozart agreed to secure a loan of $8,100 on the land purchased, or less, if approved by the bank, "the proceeds of said loan being to take up $8100 of the vendor's lien notes above described, the $8100 to be the last of the notes above described." (We call attention to the fact that the contract provided for notes aggregating only $7,100). It was agreed that a warranty deed from the bank to Cozart would be delivered to the party making the loan, for examination only, to be returned to the bank if the loan was not procured and if the loan was not procured the contract would be canceled. On the same day the bank executed a deed to Cozart for a recited consideration of $10,600. (The contract provided for $9,600 as the purchase price.) The deed recited payment of $2,500 cash. (The contract provided for and recited payment of $1,500 cash.) The deed recited the execution by Cozart to the bank of nine vendor's lien notes for $422.23 each, and one vendor's lien note for the sum of $4,500, aggregating $8,300.07. (The contract called for vendor's lien notes aggregating $7,100.) The deed recited that the $4,500 note was a first lien and the nine notes for $422.23 each were "second or junior liens to the last note." After the execution of the deed to Cozart he applied to the Federal Land Bank of Houston and the Land Bank Commissioner for loans aggregating $7,500. (This was the maximum amount authorized by law to be loaned to one farmer. 12 U.S.C.A. § 1016(b). On January 29, 1934, the Land Bank and Commissioner executed their joint approval notice for a loan on the land for $4,800, $3,200 by the Land Bank and $1,600 by the Commissioner. The approval notice contained the following conditions: (1) "Indebtedness against this property not to exceed $4800 to show required equity." (2) "When debts are required to be reduced or released, the amount reduced or re-

leased must be permanently cancelled and not renewed after the loan is closed."

January 31, 1934, Cozart, in writing, accepted the proffered loan of $4,800 in accordance with the terms and conditions of the approval notice, which contained the conditions just quoted.

After Cozart had applied for the loan he decided he preferred purchasing a different section of land from the Abilene Bank and informed Briley of his desire to be released from his obligation to purchase the section in question, and to purchase another and different section. Briley agreed with Cozart if a buyer for the section Cozart had agreed to purchase "would agree to carry out the contract that Cozart had entered into with the Citizens National Bank for the purchase of section No. 3, to the full satisfaction of said bank, we would then sell him other lands which we were offering for sale. We did find a purchaser, G. D. Oldham, for the purchase of section No. 3 * * * then we sold the said Cozart other lands * * *." With reference thereto Briley further testified: "I explained fully to Mr. Oldham, all of the details in the sale of the herein discussed land to Mr. Cozart * * * Oldham knew all of the facts in relation to the sale to Cozart. Oldham even inspected the land, and later, he entered into a contract to purchase the said section * * *. After fully discussing all of the details of the Cozart contract, Oldham inspected the land and agreed to purchase same, and assume and carry out the provisions set out in the former contract of sale entered into by the said Cozart to the Citizens National Bank, on the sale of said section No. 3. * * * I told Mr. Oldham he would have to carry out the Cozart contract satisfactory to the bank, and he fully understood said contract existed and was shown a copy of the contract at the time Oldham was discussing the purchase of this land."

Briley further testified that Cozart conveyed by warranty deed to the Abilene Bank property of the value of approximately $1,500; that the deed thereto was not recorded but was returned to Cozart "when G. D. Oldham complied with his agreement to carry out the A. E. Cozart contract * *."

Oldham testified that Briley told him Cozart had made application for a loan on the land and that it would "save the expense of another application by letting it go on through in Cozart's name, and he could deed it to me when the loan was completed. * * rather than for him to deed it back to the bank and then the bank deed it to me. He said he would expect me to bear the expense of the application, which would be $33.00, and the two of them would be $66.00. Naturally, I wanted to save the money. * *

"Q. What was to be done with the Cozart notes, was anything said about it? A. I didn't know anything about the Cozart notes that he had made to them. He didn't tell me what kind of deal they had made. He just said they had sold the place to Cozart and he decided he didn't want it and wasn't able to go on with it and was out of it. As far as I knew, I was just buying the place directly from the bank. I didn't know Cozart at all. * * *

"Q. State whether or not you had any kind of a contract with Mr. Cozart? A. No sir.

"Q. I believe you stated a few minutes ago that you entered into a contract with the Citizens National Bank to purchase this land from them? A. Yes, that is right.

"Q. Did Mr. Briley bring out to your place here in Dawson County on or about May 12, 1934, a deed of trust and ten notes, and a deed from Cozart and wife to you, and present them to you? A. Yes.

"Q. I wish you would just tell the jury now what Mr. Briley told you at the time he brought those out there. A. Well, if I remember right he told me that they hadn't gotten as much money as they expected on the application, that the loan had come and been closed up and that he would bring— he had the deed with him then, I think I am right, but that he would bring it in and have it recorded, and that it would be sent back to me, and he said there was a balance of $3,900, or approximately that, that was still unpaid on this land and that he would expect me to make these notes for it, all of which I did do.

"Q. Did he tell you anything about the Federal Land Bank Commissioner having required in connection with the loan the balance of the indebtedness to be released or discharged? A. No.

"Q. Did he tell you anything of any character with reference to the loan being granted on condition that the total indebtedness did not exceed the amount of the loan? A. No sir, not a word.

"Q. Had you learned anything at that time about those requirements or about the notes having actually been marked 'Paid' and sent in on May 10th when Mr. Briley was out there? A. No. * * *

"Q. Did Mr. Briley at that time explain to you the items which went into making up the amount of $3,900 that these notes were drawn for? * * * A. He said it was some unpaid money on the purchase price of the land over and above the loan. * * *

"Q. Were you accepting those statements that represented the balance due and unpaid on the purchase price of this land for executing the ten notes and the deed of trust? A. I would not have had I known that the Federal Land Bank required them to be canceled before they would make that loan. No, sir.

"Q. If you had known that the Federal Land Bank and Land Bank Commissioner had required the notes to be marked 'Paid in full' and surrendered, and the balance of the debt discharged, as a condition to the granting of the loan, would you have executed the deed of trust and the ten notes? A. No sir. * * *

"Q. Mr. Oldham, with reference to the Cozart deal tell the jury about it, just go a little more in detail and tell the jury what conversations you had with Mr. Briley with reference to letting the application stand in the name of Cozart. A. Well, after I had gone out and inspected the land and went back and told him that I would try to trade with him if I could, rather if he could use these lots, and we agreed on them and the price and payment and so on, and then he advised me that Cozart had made an application, and that they had accepted his application, but that he had decided that he didn't want it and wasn't able to go on with it. In other words, he wasn't going to take it. However, he had made application for a Federal Land Bank loan and in order not to slow that matter up in view of the fact that they were cutting down on these loans all along, why he would advise me to allow it to go on through in his name and just allow Cozart to deed it to me when the money came and the loan was completed, and that they would also expect me to pay the expense of the application, which was $33.00, and if they deeded it back to the bank and then deeded it to me they would also want me to pay that application expense also, and that would cost me $33.00 more. In other words, it would just save me $33.00 and save sixty or ninety days in getting the loan and maybe borrow more money than if we waited another sixty or ninety days. Naturally, I wanted to save the $33.00 be-

cause I was short of money, and I didn't know the difference and so left it entirely up to him, and that was the whole deal.

"Q. Was there anything said in that conversation with Mr. Briley with reference to your buying the land from Cozart? A. No sir."

On January 27, 1934, the Abilene Bank entered into a written contract with Oldham for the sale of the same section of land which it had theretofore contracted to sell to Cozart, and on which Cozart had applied to the Land Bank and Commissioner for a loan. This contract provided for the same total consideration as did the contract with Cozart, to-wit, $9,600. It provided for $1,200 cash, represented by conveyance to the Abilene Bank of certain real estate, and for the execution of nine vendor's lien notes for $480, each, and one for $4,000. The contract provided that Oldham would secure a loan of $4,000, and that the proceeds of said loan were to take up the last of the vendor's lien notes executed by Oldham to the Abilene Bank. It was therein stipulated that the Abilene Bank's deed to Oldham was to be delivered to the party making the loan, for examination only, and was to be returned to the bank in case the loan was not procured and that if the loan was not procured said contract would be canceled.

On February 23, 1934, the Abilene Bank sold, transferred and assigned to the Land Bank and Commissioner, acting under part 3 of the Emergency Farm Mortgage Act of 1933, 12 U.S.C.A. § 1016 et seq., "an unpaid balance of $4640, principal and interest, owing on those ten certain vendor's lien notes", describing the notes recited in the deed from the Abilene Bank to Cozart. The assignment contains the following paragraph: "And the Grantor hereby bargains, sells and conveys unto the said The Federal Land Bank of Houston and the Land Bank Commissioner, acting as aforesaid, all of the right, title and interest now owned or held by Grantor in and to said land by virtue of said note or notes and the lien securing same, in so far only as said lien rests upon and against the lands described in Deeds of Trust dated February 23, 1934, executed by A. E. Cozart et ux. to A. C. Williams, Trustee for said Bank and said Commissioner."

The notes executed by Cozart and described in the deed to him were transferred and delivered to the Land Bank and Commissioner and were marked "paid" by the

Abilene Bank on April 6. Each of the notes had the following indorsement signed by the Abilene Bank: "This note is hereby paid by the Federal Land Bank of Houston and the Land Bank Commissioner acting pursuant to part 3 of the Emergency Farm Mortgage Act of 1933." Thereupon, the sum of $4,800, less $120, or approximately such sum, which sum was deducted in payment of stock required to be bought, was paid to the Abilene Bank by the Land Bank and Commissioner.

On May 10, 1934, Cozart executed and delivered to Oldham a deed to the land in question for a recited consideration of $9,829.26. The deed recited the payment in cash of $1,280. The consideration recited as cash was actually paid by conveyance by Oldham, or at his direction, of property valued at such sum to parties designated by the bank or Briley. The deed recited the assumption by Oldham of $4,640 owing to the Land Bank and Commissioner. (The amount owing to the Land Bank and Commissioner was actually $4,800.) The deed recited that Oldham agreed to execute notes aggregating $3,909.26, payable to the Abilene Bank and secure same by deed of trust on the land and by a chattel mortgage.

There is testimony indicating that after the execution of the deed from Cozart to Oldham, but while said deed was still in Briley's possession, and after Oldham was actually in possession and occupying the land in question, Briley procured the execution of the notes and deed of trust. The deed of trust contains the following significant statement: "The notes above described represent a part of the purchase money due the bank by the purchaser of this property but which lien was released of record in order that the purchaser could procure a loan from the Federal Land Bank of Houston, Texas but the said debt was not paid and is hereby in all things perpetuated as a part of the original vendor's lien."

In closing the loan to Cozart the Land Bank and Commissioner wrote the secretary of the National Farm Loan Association instructing him that before delivery of voucher was made, he must have in his possession "all notes taken up and duly executed transfer or release." It also recited that the loan being made by it and the Commissioner must liquidate all liens. A copy of this letter was mailed to Cozart. There is testimony indicating that all such matters were known to Briley.

On January 12, 1935, the Abilene Bank transferred and assigned to Briley the Oldham notes and deed of trust, the consideration recited being that the notes were in fact the property of Briley.

Thereafter, Oldham filed suit in Dawson County to restrain the sale of the land under the deed of trust and for cancellation of the notes and deed of trust. A temporary injunction was granted restraining the sale under deed of trust.

Plaintiff's amended petition alleged the contract for the sale of the land between the Abilene Bank and its agents; alleged the contract between the bank and Cozart, the deed from the bank to Cozart; that said deed was used as a basis for an application for a loan by Cozart to the Land Bank and Commissioner; that prior to January 27, 1934, the contract between the Abilene Bank and Cozart was canceled; that on January 27 the Abilene Bank agreed to sell said land to Oldham; that at said time Oldham did not know of the previous contract between the Abilene bank and Cozart, but was shortly thereafter informed of such contract by Briley, who advised Oldham of the execution by the Abilene Bank of the deed to Cozart, and of Cozart's application for a loan thereon, and that Briley represented to Oldham that Cozart's application for a loan would probably be acted upon and approved very shortly and told Oldham that it would save him considerable time and trouble, and that it would be easier and cheaper to permit Cozart's application to go through in Cozart's name, and that after the loan was closed Cozart would deed the land to Oldham, and Oldham would assume "all the obligations of said A. E. Cozart in connection therewith, the indebtedness recited in said deed to Cozart to be in fact the indebtedness of plaintiff. It was the understanding between plaintiff and said Briley and with said A. E. Cozart that the record title would be placed in A. E. Cozart, and A. E. Cozart would obtain the loan purely as a matter of convenience and accommodation to plaintiff, * * * that the plaintiff was the real purchaser of said lands and A. E. Cozart merely to be the nominal holder of the title for the use and benefit of this plaintiff." Plaintiff further alleged the approval by the Land Bank and Commissioner of the application for the loan to the extent of $4,800, upon the conditions hereinbefore quoted; that Briley was informed of such approval notices

and their conditions; the approval and acceptance by the Abilene Bank of the $4,800 loan. Plaintiff further alleged the facts substantially as hereinbefore set out.

Plaintiff alleged Briley knew that as a condition to making said loans, the Land Bank and Commissioner required there should be no other indebtedness against said land; that Briley knew the Land Bank and Commissioner required the excess of the Abilene Bank's indebtedness over and above said loan be released and remitted as a condition to granting said loans; that the Abilene Bank's vendor's lien notes were delivered to the Land Bank and Commissioner with the understanding that the money received by the Abilene Bank from said loan constituted full and complete satisfaction of all right, title and claims of all kinds of the Abilene Bank, and was in full payment and satisfaction of the notes given by Cozart to it.

Plaintiff further alleged that defendant caused the deed from Cozart to him and the notes aggregating $3,909.20, and the deed of trust securing their payment, to be prepared; that Briley represented to Oldham the sum of $3,909.20 represented the balance due on the notes executed by Cozart to the Abilene Bank over and above the amount of the loan from the Land Bank and Commissioner; that the same was a just and existing indebtedness of Cozart to the Abilene Bank and plaintiff was obligated under his agreement to take care of said balance; that plaintiff believed said representations, relied on them, and believing that same was a valid and outstanding obligation owing by Cozart to the Abilene Bank, which plaintiff had agreed to assume and take care of, was thereby caused by Briley to execute said notes and deed of trust. That plaintiff did not then know the Land Bank and Commissioner had required that the Cozart indebtedness be reduced to the amount of the loans made by the Land Bank and Commissioner, as a condition to making said loans, and did not know that the Abilene Bank had in fact marked said notes paid and transferred and delivered said notes and all liens securing their payment to the Land Bank and Commissioner and had fully discharged and released the balance of the Cozart notes. That if plaintiff had known of such facts he would not have executed said notes and deed of trust. Plaintiff alleged Briley knew the facts and that the Land Bank and Commissioner had required that

all other indebtedness other than the amount owing by Cozart to the Land Bank and Commissioner be released and discharged before said loans were made, and that Briley knew all of the facts alleged by plaintiff; that Briley saw to the execution of the instruments heretofore referred to and actively handled the matter of obtaining said loans. That the acts and conduct and representations made by and through said transfer and indorsements of payments on the Cozart notes showing that all but the amount of the loans to be made by the Land Bank and Commissioner had been paid on the Cozart notes "were deliberate and intentional misrepresentations of the facts to the Land Bank Commissioner and the Federal Land Bank of Houston to aid in the obtaining of said loans, and the said W. G. Briley actively participated in such misrepresentations."

Plaintiff alleged that the Abilene Bank did in good faith reduce said indebtedness to the amount of indebtedness owing the Land Bank and made the indorsements thereon with the purpose to fully discharge the balance of said indebtedness over and above the amount of said loans, and that the Abilene Bank was satisfied with the receipt of said loans and did not claim any further amount on account of the Cozart notes, and on account of the sale by it to Oldham. That Briley procured the notes and deed of trust from Oldham to the Abilene Bank for his own use and benefit. That the Abilene Bank had nothing to do with procuring said notes, had never claimed said notes, or any interest therein, and did not direct or authorize the procuring of said notes. Plaintiff alleged that after entering into the contract with the Abilene Bank for the purchase of the land, he conveyed to the Abilene Bank, or to Briley, or to whom Briley directed, his property constituting the asserted cash consideration for the sale to him, and with the consent of the Abilene Bank and Briley, took possession of the land, with his family moved thereon and commenced living thereon preparing the land for farming, and made valuable improvements prior to the execution of the notes aggregating $3,909.20, and the execution of the deed of trust securing their payment.

That the land was purchased for a home for himself and family with the intention of using, occupying and claiming it as a

homestead; that he and his family were actually using, occupying and claiming same as a homestead at the date of the execution of said notes and deed of trust, that at the date of the execution of said notes and deed of trust the equitable title to said land was vested in plaintiff and he was entitled to conveyance of the legal title from Cozart, and that the only obligation of plaintiff to Cozart "was to assume and take care of that part of such indebtedness incurred in the name of A. E. Cozart as was then outstanding and unsatisfied" which, plaintiff alleged, was the debt to the Land Bank and Commissioner; that Cozart conveyed the land to plaintiff for the purpose of carrying out the contract between plaintiff and the Abilene Bank; that Cozart had no interest in the land or in conveying same other than placing the legal title thereto in plaintiff as contemplated by the parties to said transaction. Plaintiff alleged that the status and rights of the parties were the same "as if the deed which was made by the Citizens National Bank to the said A. E. Cozart had been made direct by the Citizens National Bank of Abilene to plaintiff and plaintiff had obtained the loans from the Federal Land Bank of Houston and Land Bank Commissioner in his own name."

Plaintiff alleged a want of consideration for the execution of the notes and the deed of trust. That the acts and conduct of Briley in representing to plaintiff there was a balance of $3,909.20 due the Abilene Bank on the Cozart notes, when, in truth, the portion not taken up and extended by the Land Bank and Commissioner had been fully released and discharged, and the entire balance of said notes transferred to the Land Bank and Commissioner constituted false and fraudulent representations to plaintiff, made for the purpose of inducing him to execute said notes and deed of trust; that Briley knew that they were false; that plaintiff relied thereon and executed such notes and deed of trust and but for the alleged false and fraudulent representations of Briley would not have done so. Wherefore, plaintiff concluded said notes and deed of trust should be held void and canceled on account of such fraudulent representations and the cloud cast upon his title by recording the deed of trust removed. Plaintiff further alleged the Emergency Farm Mortgage Act of 1933, with reference to loans made by the Land Bank and Commissioner to

farmers, provided, in part, as follows: "The amount of the mortgage given by any farmer, together with all prior mortgages or other evidences of indebtedness secured by such farm property of the farmer, shall not exceed 75 percentum of the normal value thereof, as determined upon an appraisal * * *." 12 U.S.C.A. § 1016 (b).

That in connection with Cozart's application for loans an appraisal was made of said lands and said lands were appraised at the sum of $6,400; that loans were approved by the Land Bank and Commissioner for $4,800, conditioned upon the indebtedness against said property being reduced to such sum in accordance with said statute and regulations of the Commissioner. Plaintiff alleged that the transfer by the Abilene Bank to the Land Bank and Commissioner and marking the Cozart notes "paid", and the delivery of said notes to the Land Bank and Commissioner, constituted a direct and positive representation by the Abilene Bank and Briley to the Land Bank and Commissioner to the effect that the indebtedness against said land had been reduced, as required by law, and the regulations of the Land Bank and Commissioner; that Briley was, therefore, estopped, as a matter of law, to assert that said representations were not true. Plaintiff further alleged the following portion of part 3 of the Emergency Farm Mortgage Act of 1933, 12 U.S.C.A. § 1019, "Any person who shall knowingly make any material false representation for the purpose of obtaining any loan under this subchapter of this title, or in assisting in obtaining any such loan, shall, upon conviction thereof, be fined * * *", etc.

Plaintiff alleged that in the event the Abilene Bank and Briley did not intend to release and discharge the balance of the indebtedness over and above the amount of the Land Bank and Commissioner's loans, and if such balance was not in fact discharged and released, then such loans by the Land Bank and Commissioner and the notes and deed of trust executed by plaintiff to the Abilene Bank, as a part of the same transaction, were procured by and through false representations made for the purpose of procuring and assisting in procuring said loans, and were direct violations of the penal provisions of the Federal Statutes, and said deed of trust and notes were void and

unenforceable as involving a violation thereof. Plaintiff further alleged that since the statute, with reference to Commissioner's loans, prohibits any lien in excess of 75 per cent of the appraised value, such additional liens and excess of such 75 per cent of the appraised value were void.

Plaintiff alleged that the negotiation and handling of said loans were left by plaintiff entirely to Briley and that plaintiff did not know anything about how the loans were handled or obtained except he had been advised that the loans were approved and made in the sum of $4,800; that plaintiff did not know of the requirement by the Land Bank and Commissioner that the debt owing by Cozart to the Abilene Bank be reduced to the amount of the loan, to-wit, $4,800, and did not know that the debt evidenced by the Cozart notes had been so reduced, as a condition to obtaining said loan, until shortly before the filing of suit.

Plaintiff designated a certain 200 acres out of the section conveyed to him as his homestead.

Plaintiff prayed for judgment declaring null and void and canceling the notes and deed of trust; that defendant be perpetually enjoined from enforcing said notes and deed of trust; that the cloud cast on his title, caused by recording the deed of trust, be removed; and, in the alternative, in the event the court found plaintiff was not entitled to cancellation of the notes and deed of trust as to the entire tract of land, that the deed of trust lien be canceled and removed so far as plaintiff's homestead was concerned, etc.

Defendant answered by general demurrer and general denial, and alleged that plaintiff agreed to purchase the land in question and to assume the payment of the loan obtained by Cozart from the Land Bank and Commissioner, and in addition to the assumption of the payment of such indebtedness, that he would execute notes to the Abilene bank for $3,-909.20; that such agreement was the consideration for the conveyance of the land to him; that after Cozart obtained the loan the land was conveyed to plaintiff and he assumed the payment of such loans and executed the notes. Defendant specially alleged that it was not true that the Abilene Bank entered into an agreement with the Land Bank and Commissioner, Cozart, or plaintiff, that "after the loans were made, it would not ask, require, or accept any renewal or new obligation in lieu of the amount remitted; that the Citizens National Bank entered into no agreement of any kind that it would not accept any new notes against said property; that, on the contrary, after the plaintiff had made his arrangements to purchase the said property from Cozart and had agreed to assume the payment of the loans which Cozart was to obtain and to execute the notes now owned by this defendant and involved in this suit, the said Cozart proceeded to complete the arrangements for the loan; that thereafter at the request of the said Cozart, and so that he might obtain the loan and make his sale to the plaintiff in accordance with plaintiff's agreement, the said Citizens National Bank transferred to said loan companies, all the notes which had been held against said property; that said transfer was executed by said bank and delivered to the loan companies for the benefit of the said Cozart and the plaintiff, so that they could make their trade, and such transfer was executed and delivered with the express understanding and agreement, on the part of the plaintiff and the said Cozart, that the said Cozart was to convey the said land to plaintiff and plaintiff was to assume the payment of the first lien indebtedness and execute the notes involved in this lawsuit as part of the purchase price of the said land from the said Cozart."

By way of cross-action defendant alleged the ownership of the land by the Abilene Bank; that it entered into a contract with Cozart for its sale; that the sale was consummated, the consideration paid, and the notes executed by Cozart; that Cozart applied to the Land Bank for a loan with which "to pay a portion of his indebtedness"; that thereafter the Abilene Bank entered into an agreement with Oldham for the sale of said land, that "it was understood and agreed that the said Cozart would obtain the loan and convey the said property to the plaintiff for a consideration of $9600 to be paid by assumption, by the plaintiff, of the payment of the loan obtained by the said Cozart and by the execution by plaintiff of 10 notes for $390.92 each; that in accordance with the said agreement, the said loan was obtained." That thereafter Cozart conveyed the land to Oldham; that as a consideration for said conveyance Oldham assumed the payment

of $4,640 to the Land Bank and Commissioner and executed the notes aggregating $3,909.20 and a deed of trust securing their payment; that the notes aggregate $3,909.20, and the deed of trust securing same were transferred by the Abilene Bank to Briley; that plaintiff had defaulted in the payment of said notes and defendant had declared all of said notes due and payable. Wherefore, defendant prayed for a judgment for his debt and foreclosure of the deed of trust lien, etc.

The evidence introduced included all of the instruments heretofore mentioned and was substantially as indicated. At the close of the evidence the court instructed a verdict for defendant, and against the plaintiff, and entered judgment in accord with said instructed verdict. From this judgment plaintiff has appealed.

Appellant's assignments of error, briefly stated, are to the effect (1) That the court erred in instructing a verdict (and rendering judgment) for defendant against plaintiff on both the main suit and (2d) defendant's cross-action, and (3) in refusing to instruct a verdict (and render judgment) for plaintiff, for the reasons: (a) That the notes totaling $3,909.20, which plaintiff sought to cancel, were without any valid or legal consideration and void; (b) that there was no valid consideration for the execution of said notes and deed of trust, the purported consideration therefor being a purported pre-existing indebtedness owing by plaintiff to the Abilene Bank, and the evidence showing that prior to their execution all indebtedness of plaintiff to the Abilene Bank had been satisfied and discharged by and through the Land Bank and Commissioner, in consideration for payment of proceeds of loans on the land in controversy to the Abilene Bank; (c) for the reason that the evidence showed said notes and deed of trust were void because the Land Bank and Commissioner, acting under and pursuant to part 3 of the Emergency Farm Mortgage Act of 1933, approved loans against the land involved for the purpose of taking up and extending the indebtedness held by the Abilene Bank, said loans being approved on condition that the indebtedness against said land be reduced and released to the extent that the indebtedness exceeded the loan, and the evidence further showing that the Abilene Bank marked the notes, given by Cozart to it as the purchase price for the

land, paid, and surrendered all the notes to the Land Bank and Commissioner in consideration for payment to it of the proceeds of said loans, and because the acts and conduct of the Abilene Bank in connection with said loans "constituted a direct and positive representation" to the Land Bank and Commissioner that the entire indebtedness held by the Abilene Bank against said land was liquidated and taken up by said loans, and that the indebtedness in excess of said loans was released and discharged, and such acts and conduct of the Abilene Bank amounted to a false and fraudulent representation by the Abilene Bank, and Briley, for the purpose of procuring said loans, rendering the notes given in renewal of a purported balance owing the Abilene Bank on the original indebtedness "void as in violation of law and against public policy." (d) For the reason that the evidence showed that the Land Bank and Commissioner, acting under said Emergency Farm Mortgage Act, made said loans "on condition that said loans liquidate entire indebtedness against said land; that said land was appraised under the terms and provisions of said Act for the purpose of said loan at a value of $6,400, and therefore the indebtedness claimed by (defendant) as represented in and by the deed of trust and notes of May 12, 1934, constituted an indebtedness against the land in excess of 75 per cent of the appraised value of said land, and said part 3 of Emergency Farm Mortgage Act of 1933 expressly prohibits the total indebtedness against lands upon which loans are made under terms of said act exceeding 75 per cent of such appraised value, and said deed of trust and notes * * * are void." (e) For the reason that the evidence showed defendant procured the execution and delivery of said notes and deed of trust by false and fraudulent representation that there was an outstanding balance to the amount of said notes, owing on the contract purchase price for the land and that defendant concealed the fact that the purchase money notes had been discharged and therefore the notes were void.

We call attention to the following provisions of the Federal Statutes, U.S.C.A., title 12: "Restrictions on Loans of Federal Land Banks Based on First Mortgages. Sec. 771. Restrictions enumerated

"No Federal land bank organized under this chapter shall make loans except up-

on the following terms and conditions: * * *

"Fourth. Purposes of loans enumerated.—Such loans may be made for the following purposes and for no other: * *

"(d) To liquidate indebtedness of the owner of the land mortgaged incurred for agricultural purposes * .* *."

Then follow provisions limiting the amount of loans by Land Banks to "50 per centum of the value of the land mortgaged and 20 per centum of the value of the permanent, insured improvements thereon, said value to be ascertained by appraisal * * *." Sec. 771, subd. 5.

Sec. 781, subd. 2, authorized Federal Land Banks to invest funds in first farm mortgages and "In order to reduce and/or refinance farm mortgages, to invest such funds as may be in its possession in the purchase of first mortgages on farm lands * * * at a price which shall not exceed in each individual case the amount of the unpaid principal of the mortgage on the date of such purchase or exchange, or 50 per centum of the normal value of the land mortgaged and 20 per centum of the value of the permanent insured improvements thereon as determined upon an appraisal made pursuant to this subchapter, whichever is the smaller:"

Sec. 981, provides a penalty to be assessed against an applicant for a loan from a Federal Land Bank "who shall knowingly make any false statement in the application for such loan * * *."

Sec. 987, provides: "Any mortgagee who shall knowingly make any false statement in any paper, proposal, or letter, relating to the sale of any mortgage, to any Federal land bank * * * shall be punished * * *" etc.

With reference to loans to farmers by the Commissioner, 12 U.S.C.A. § 1016 (b) provides: "The amount of the mortgage given by any farmer, together with all prior mortgages or other evidences of indebtedness secured by such farm property of the farmer, shall not exceed 75 per centum of the normal value thereof, as determined upon an appraisal made pursuant to the preceding subchapter * * *."

Sec. 1019, provides: "Any person who shall knowingly make any material false representation for the purpose of obtaining any loan * * * or in assisting in obtaining any such loan, shall, upon conviction thereof, be fined * * *" etc.

It is evident the law limits the Commissioner in making loans so that a loan made by the Commissioner to a farmer "together with all * * * other evidences of indebtedness secured by such farm property of the farmer, shall not exceed 75 per centum of the normal value thereof, as determined upon an appraisal * * *." The evidence showed that the land was appraised by the Land Bank and Commissioner at $6,400. Loans aggregating $4,800 were made on said farm by the Land Bank and Commissioner. This was 75 per cent of its appraised value. The loan by the Commissioner was not authorized if there were any other "indebtedness secured by such farm."

■ It is equally evident that the Emergency Farm Mortgage Act contemplated that when loans were made by the Land Bank and Commissioner the farmer should have a real equity in the farm and that the Land Bank and Commissioner would not make loans where all debts and liens retained against the farm were for an amount in excess of what the farmer could probably pay. Such intention is evidenced, (among others), by the provision of 12 U.S.C.A. § 771, 5th subdivision, providing, in part, that: "In making said appraisal the value of the land for agricultural purposes shall be the basis of appraisal and the earning power of said land shall be a principal factor" and by Sec. 781, 2nd subd., authorizing the Federal Land Banks to invest funds in first mortgages on farms in order to reduce or refinance farm mortgages, or to exchange farm land bonds for such mortgages "at a price which shall not exceed in each individual case the amount of the unpaid principal of the mortgage * * * or 50 per centum of the normal value of the land mortgaged and 20 per centum of the value of the permanent insured improvements thereon as determined upon an appraisal, * * * whichever is the smaller."

We think it cannot be questioned that if Oldham were not here involved and Cozart had executed the notes and deed of trust in controversy, said notes would have been void as in violation of statute and contrary to public policy, if the following facts were established: (a) That the Abilene Bank transferred and delivered its notes to the Land Bank and Commissioner with an agreement that it would not renew the unpaid balance of its debt after closing the loan, or (b) If the Abilene Bank, in assisting Cozart to obtain the

loan, represented to the Land Bank and Commissioner that all of Cozart's debts to it in excess of the amount loaned by the Land Bank and Commissioner to Cozart had been paid, or discharged. Under such circumstances a secret agreement between the Abilene Bank and Cozart that, after the closing of such a loan, Cozart would execute notes for the unpaid balance would be in violation of 12 U.S.C.A. §§ 987 and 1019, and contrary to the spirit, intention and purpose of the Emergency Farm Mortgage Act.

In International Harvester Co. (Plaintiff) vs. Louis M. Young et al. (Defendants), Michigan Circuit Court, the Harvester Company sued the defendants upon a note signed by them. Earl Young owed plaintiff about $2,700. He made application to a Federal Land Bank for a loan. The appraisal of the real estate offered to secure the loan necessitated the scaling down of the claims of Earl Young's creditors. Plaintiff agreed to accept $1,000 in full settlement of its claim. The loan was consummated and the proceeds distributed by the Land Bank. Plaintiff received $1,000 from the loan and executed a creditors' agreement addressed to the Land Bank and Commissioner in which, in substance, it was recited that for the purpose of inducing the Land Bank and Commissioner to make the loan plaintiff agreed to accept $1,000 in full settlement of its claim and to release Earl Young from his entire indebtedness to plaintiff. Thereafter plaintiff procured from Earl Young a bill of sale to certain farm machinery, the only consideration for which was the unpaid portion of his debt to plaintiff. Thereafter plaintiff, without any change in the possession of Earl Young's machinery, purported to sell same to Earl Young's sons, the defendants in the suit, and took their note for $900 as the purported consideration for sale of the machinery. The testimony of representatives of the Land Bank and Commissioner was "that the loan was made upon condition that from its proceeds all of the debts of the borrower should be paid."

The court held that plaintiff's acts contravened public policy; that the notes were void and "that the defendants may take advantage of the invalidity on the grounds of public policy, as well as of a failure of consideration."

The Home Owners' Loan Act of 1933 contains provisions similar to provisions of the Emergency Farm Mortgage Act of 1933, and provides penalties for knowingly making false statements for the purpose of influencing the action of the Home Owners' Loan Corporation. 12 U.S.C.A. § 1467. Under said Act it has been held that when a mortgagee, in connection with procurement of a loan, discharged its second and third mortgages as paid, delivered notes secured thereby to HOLC and received from the borrower a note secured by a second mortgage, the secret note and mortgage for the balance, represented by mortgagee to HOLC as discharged, was invalid as violative of the Act.

First Citizens Bank & Trust Co. v. Speaker, 1936, 159 Misc. 427, 287 N.Y.S. 831. There was a decision to the same effect in Jessewich v. Abbene, 154 Misc. 768, 277 N.Y.S. 599. Also, see, U. S. v. Kreidler, D.C., 11 F.Supp. 402; Home Owners' Loan Corp. v. Stevens, 120 Conn. 6, 179 A. 330. Also, see New Century Mfg. Co. v. Scheurer, Tex.Com.App., 45 S.W.2d 560.

Smeltzer v. McCrory, Tex.Civ.App., 101 S.W.2d 850, is the only Texas case in which the question here presented has been discussed. Smeltzer and wife sued McCrory and another to cancel two second lien notes and deeds of trust securing their payment. Smeltzer owned land on which there was a large indebtedness. He obtained a loan from the Federal Land Bank on this land. Before the consummation of the loan, McCrory estimated the amount of the proceeds of the loan which could be procured and applied on Smeltzer's debt to him and discovered that such amount would be insufficient to pay off said debt, evidenced by the original vendor's lien notes which defendants held, (together with sums advanced to satisfy judgment liens) and had Smeltzer execute new notes for the difference. (Notes executed in renewal thereof and the deed of trust securing same were attacked and their cancellation sought by plaintiff.) The next day defendants, McCrory et al., assigned and delivered to the Federal Land Bank the original vendor's lien notes. The assignment recited: "Any and all portions of said above described notes which is hereby assigned has been fully paid and the lien securing the payment thereof is hereby released." The trial court directed a verdict for defendants and rendered judgment in accord with the verdict. The Court of Civil Appeals reversed the judgment and rendered judgment canceling defendants' notes and deed of trust, holding same void

because violative of 12 U.S.C.A. § 1019. A writ of error was granted by our Supreme Court on McCrory's eighth assignment of error, which was as follows: "The court erred in holding the notes and deeds of trust void insofar as the same represented the $714 due defendants by reason of the advancements made by them in discharging judgments on plaintiffs' land, such indebtedness being no part of the vendor's lien indebtedness and no false representation or statutory violation having been made concerning it."

The difficulty of the present decision is in applying the law and rules of decision herein mentioned to the situation presented by the sale to Oldham, or his substitution as a purchaser for Cozart. If Cozart had completed the purchase, or, if Cozart had reconveyed the land to the Abilene Bank, in the absence of a conspiracy to avoid the purpose and effect of the Federal statutes, there can be no doubt that either Cozart or the Abilene Bank could have sold the land to Oldham for any sum and on any terms mutually agreed upon. However, if there were an agreement between the Abilene Bank (or Briley) and Cozart that said bank would represent to the Land Bank and Commissioner that the vendor's lien notes in excess of the loans had been paid or discharged and that Cozart would thereafter execute notes for such excess so represented as paid or discharged, and while the contract was not fully executed, for the purpose of avoiding the effect of said statutes, Oldham was in fact substituted for Cozart as a purchaser, and, in order to save the time and expense incident to procuring a loan by Oldham, it was agreed that Oldham would not procure a loan from the Land Bank and Commissioner, but instead would assume payment of Cozart's debt to the Land Bank and Commissioner, and so far as possible step into Cozart's shoes. And if, in fact, Cozart was the mere conduit for the transfer of title to Oldham, we think, under such circumstances, the execution of the notes by Oldham to the Abilene Bank for the unpaid portion of its debt represented to the Land Bank and Commissioner to have been paid or discharged, if it was so represented, renders said notes void and Briley was in no better position than he would have been had Cozart executed the notes. The mere substitution of a new party for one already a party to an illegal contract, carrying into effect in a new form an invalid contract does not give validity to such contract and "would not relieve it from the effect of the illegality of the original consideration." Shelton v. Marshall, 16 Tex. 344, 354; Hall v. Edwards, Tex.Com.App., 222 S.W. 167; 13 C.J. 424, sec. 360; Read v. Smith, 60 Tex. 379, 382; 3 Williston on Contracts, sec. 1753; Seeligson v. Lewis & Williams, 65 Tex. 215, 57 Am.Rep. 593; Beer v. Landman, 88 Tex. 450, 456, 31 S.W. 805; W. T. Rawleigh Co. v. Land, 115 Tex. 319, 279 S.W. 810, 813; Scoggins v. Furst & Thomas, Tex.Civ.App., 9 S.W.2d 405, writ dismissed; Republic Trust Co. v. Taylor, Tex.Civ.App., 184 S.W. 772; 10 Tex.Jur. 248, sec. 142; 10 Tex.Jur. 188; 12 Am.Jur. 645, 662; Specht v. Collins, 81 Tex. 213, 16 S.W. 934; Notes 59 Am.St. Rep. 638; Notes L.R.A.1917A 724; 9 Tex. Digest, Contracts, p. 77 Federal Land Bank v. Warner, 42 Ariz. 201, 23 P. 2d 563, Rev., 292 U.S. 53, 54 S.Ct. 571, 78 L.Ed. 1120, 91 A.L.R. 380; Wallace v. Benner, 200 N.C. 124, 156 S.E. 795.

If the Abilene Bank (or Briley) and Cozart had an agreement to the effect that the Abilene Bank would represent to the Land Bank and Commissioner that payment on Cozart's indebtedness to the bank had been made reducing it to $4,800 (the amount of the Land Bank and Commissioner's loan), or that the Abilene Bank had voluntarily canceled the amount of Cozart's debt to it in excess of the amount of said loan, and it was understood between Cozart and the Abilene Bank (or Briley) that Cozart would execute to the Abilene Bank his notes, secured by a lien on said land, for the unpaid balance of Cozart's debt to the Abilene Bank, such an agreement was void because violative of the Federal Statutes. And if, as a matter of fact, Oldham was substituted as a purchaser for Cozart, as a continuation of such scheme, and Oldham's notes, for Cozart's unpaid debt (represented to have been paid or discharged) were secured in carrying out such illegal contract, they are likewise void as violative of the statutes and contrary to public policy.

Read v. Smith, 60 Tex. 379; 13 C.J. sec. 460, 461, 462, pp. 509, 510.

We think the quotation at page 363 of the opinion in Shelton v. Marshall, supra, applicable to the present situation: "It cannot be permitted that the parties to a contract, void by law, may evade the provisions of that law, by giving up the security originally taken, and substituting another in its place. It is well settled, that when

an original contract is illegal, any subsequent contract, which carries it into effect, is also illegal. And, whenever, in cases of this character, the subject matter of the contract can be traced back, between privies, to an original illegal contract, the substituted security is void; and even if the parties, liable in the last security, were not privy to the illegal bargain, the same result has been held to prevail, if the true destination of such security was to secure such a bargain, made by others, for the use of him who was to reap the fruits of the bargain."

In Horbach v. Coyle, 8 Cir., 2 F.2d 702, 707, it is said:

"Where a contract grows immediately out of and is connected with a prior illegal contract, the illegality of such prior contract will enter into the new and render it illegal, and the rule has been broadly stated that if the connection between the original illegal contract can be traced and if the latter is connected with and grows out of the former, no matter how many times and in how many different forms it may be renewed, it cannot form the basis of recovery. 13 C.J. p. 509, § 460; Armstrong v. Toler, 11 Wheat, 258, 6 L.Ed. 468; Tomkins v. Seattle Cons. & Dry Dock Co., 96 Wash. 511, 165 P. 384.

"A new agreement, in furtherance of or for the purpose of carrying into effect any unexecuted provisions of a previous illegal agreement is likewise illegal and void. 13 C.J. p. 509, § 460; Blasdel v. Fowle et al., 120 Mass. 447, 21 Am.Rep. 533; In re Canfield (D.C.) 190 F. 266, Id., 193 F. 934, 113 C.C.A. 562; Coulter et al. v. Robertson, 14 Smedes & M. (Miss.) 18, 29; Barton & Woodworth v. Port Jackson & U. F. Plank Road Co., 17 Barb. (N.Y.) 397, 408; Shelton v. Marshall, 16 Tex. 344."

It is a well established legal proposition that, under such conditions, defendants' good intentions, or lack of knowledge that the contract was in violation of the law, cannot avail him as a defense.

We think the case should have been submitted to the jury on the issues indicated, and that the court erred in instructing a verdict for defendant.

The judgment is reversed and the cause remanded.

LESLIE, C. J., concurs.

FUNDERBURK, Justice (dissenting).

I am unable to see that the judgment of the trial court should not be affirmed. The contract between Citizens National Bank of Abilene and Briley and Huddleston seems, on its face, a legal contract. True, it contemplated that after procurement of loans the bank was to hold the notes not transferred to the lender secured only by a subordinate lien; but that, so far as I can see, is no evidence of illegality in the contract. The contract does not specify that the loans were to be procured only from the Federal Land Bank or Commissioner. If laws or rules and regulations governing loans by a Federal Land Bank or Commissioner made it impossible for the bank to retain ownership of a part of the series of purchase money notes that fact would not make the contract an illegal one. It would simply prevent procurement of the loans from that particular source or require a modification of the original plan. The more reasonable view would be, if the loans were procured from that source, that the contract would be modified to conform to the law or regulations. I am unable to find in the statement of facts any evidence of an agreement to which the Citizens National Bank of Abilene and Cozart were parties, or the intent or purpose of either of them, that Cozart, after the cancellation and discharge of a part of the purchase money notes, was to execute to the bank new notes in lieu thereof. The contract between said parties provided that the deed from the bank to Cozart was not to be delivered until the matter of the loan was settled. In other words, the bank, by its contract retained the right to call off the deal entirely, provided a loan upon satisfactory terms to it was not procured. Had Oldham never been produced by Briley as a prospective purchaser of the land there is no way of knowing, or legitimately inferring, that the bank would or would not have released, and marked discharged, the said notes other than those transferred to the Federal Land Bank and Commissioner. It is very probable, I think, that when the Abilene Bank was apprised of the demand that all the notes, except those transferred, be discharged and released, it would have called off the deal. If not, it cannot be presumed that it would have insisted as a condition of proceeding with the sale to Cozart that Cozart execute notes in lieu of those released; or that Cozart would have agreed to such demand if made. That

would have been contrary to the plain terms of his written contract. No such agreement could have been proved, over the objection that it was in conflict with the terms of the written contract.

Now it so happened that after the contract was made by the Abilene Bank and Cozart providing for sale of the land, and before the transaction was completed, Cozart desired to be released. This was before the Abilene Bank was ever confronted with the alternatives of calling the deal off, or releasing the notes not transferred to the Land Bank and Commissioner. Then Briley, who in a way represented himself in an interest contrary to the bank, but also represented the Abilene Bank in another way, produced to said bank a new man, G. D. Oldham, willing, if satisfactory terms could be made, to purchase the land for $15 per acre. A contract was made with him which, it may be presumed, contemplated on the part of the bank the calling off of the deal with Cozart. This contract had no relation to the deal with Cozart and like the contract between the bank and Cozart there is nothing on its face to show any purpose or intention to violate any Federal law, rule or regulation of the Federal Land Bank or Commissioner, or any principle of public policy. I cannot see, however, that this contract has any important bearing on the questions presented. It is very certain that the acquisition of the land by Oldham was not in accordance with the terms of that contract. That contract contemplated a purchase directly from the bank, and the procurement of a loan by Oldham. The deal that was actually made involved delivery of the deed previously made to Cozart and the deraignment of the title to Oldham from Cozart. The actual transaction by which Oldham acquired the land was so essentially different from the one contemplated in the original contract as to show that such original contract was, in effect, abandoned. It is idle, as I see it, to talk about the deal that was made as being in fact a sale of the land by the Abilene Bank to Oldham. The Federal Land Bank and Commissioner actually got no title to the land upon which they hold their lien, save upon an actual, as distinguished from a simulated, conveyance of title from the Abilene Bank to Cozart; and Oldham got nothing by his deal save that he got actual title to the land, not from the Abilene Bank, but from Cozart. As I see it, nothing can alter the fact that the Abilene Bank sold the land to Cozart and Cozart sold it to Oldham.

When, pending the deal with Cozart, Oldham appeared upon the scene willing to purchase the land and pay, or promise to pay, $15 per acre, the Abilene Bank was presented with an opportunity by which it could get its required purchase price for the land, and at the same time, in entire good faith, cancel and discharge all of the purchase money notes agreed to be given by Cozart, except those required to be transferred to the Federal Land Bank and Commissioner as security for the amount of the loan. It is true that it could not do this except by agreement of Cozart. Absent the consent of Cozart that the notes representing the amount of the purchase price of the land which Oldham was willing to pay over and above the amount of the loan which he was to assume should be made payable to the Abilene Bank, or payable to Cozart and by him indorsed to the bank, it may be assumed that the bank would not have permitted delivery of the deed to Cozart, but, on the contrary, would have called off the deal. It is apparent, however, that if Cozart agreed—that being, of course, a matter for his own determination—that the notes should be made to the bank, there was no obstacle to prevent the bank from going ahead with its deal with Cozart by delivery of the deed to him and in entire good faith discharging and giving up all other notes not transferred. It could well afford to do this because in lieu of its loss, a new purchaser of the land who had no dealings with the Land Bank and Commissioner was willing to give his notes for the agreed value of the land over and above the amount of the assumed loan, and Cozart was willing that said notes be paid to the bank.

Even if there was illegality in the previous contract, which, as said, I am unable to find any evidence to show, it seems to me a situation is presented very much analogous to one where a purchaser of land as a part of the consideration for the purchase assumes and agrees to pay a note void in part as violating the law against usury. It is a well known principle that usury cannot be pleaded against such an assumption because the party's right to contract for the payment of the consideration of the land must be respected and the fact that it happens to be the amount of a usurious obligation is of no importance because, after all, the

former obligation is merely effective to measure the amount of the new obligation. So in this case it seems to me if it should be granted that it was contemplated that Cozart should execute new obligations to the bank to take the place of those which the bank was required to discharge and release in order to get the loan, the mere fact that such released and discharged obligations constituted the balance of consideration which a new purchaser of the land obligated himself to pay, in addition to the amount of the loan, would not affect the new obligation with the vice of the old.

This suit is grounded upon the theory that the sale of the land by the Abilene Bank to Cozart was a mere colorable or simulated transaction and in truth the Abilene Bank sold the land to Oldham. It may be admitted that, if in the beginning there had been an agreement between Oldham and the Abilene Bank by which the sale was to be made by the bank to Oldham, and Cozart was to be used merely to give the semblance of legality to the transaction; it being contemplated that the title was to be made to Cozart, the loan was procured by a release of the excess indebtedness, then a conveyance of the title by Cozart to Oldham, he assuming the amount of the loan and executing his notes for the balance of the consideration, the notes payable either directly to the bank or to Cozart with the agreement that they were to be indorsed by Cozart to the bank for the purpose of enabling the parties to circumvent the law or regulation against retaining indebtedness over and above the amount of such loan, the transaction would have been void. That such was not the real transaction, whatever any of the parties may say about it, is well and conclusively exemplified by this record. The plaintiff admits that when he signified his assent to purchase the land for $15 per acre he knew nothing of the previous deal with Cozart. While he says that he had no dealings with Cozart it is very clear that he made Briley his agent for some of the things that were done, or accepted what he did for plaintiff so as to be bound by it.

Another fact that cannot be gainsaid is that there was no complete substitution of Oldham for Cozart. Cozart, for aught that appears to the contrary, is personally liable on the notes held by the Federal Land Bank and Commissioner and the entire amount of the indebtedness may be collected from him if Oldham fails to pay it, and the title of the land should fail, or for any reason be insufficient to discharge the debt. The Abilene Bank, when it determined to go ahead and complete the sale to Cozart and release all of Cozart's indebtedness to that bank, except that transferred to the Federal Land Bank and Commissioner, took a chance of disposing of all of its interest in the land for the amount of the loan paid to it, since Cozart had it in his power to require the notes of Oldham be made payable to himself and to dispose of such notes as he saw fit. When the deed to Cozart was delivered Cozart was the owner of the land, free and clear of all encumbrances, save and except the $4,800 indebtedness to the Federal Land Bank and Commissioner. He could dispose of it in any way he saw fit, and the purchaser would take good title subject only to the lien securing said loan and the terms of the new sale. There can be no question of Cozart's right and power to sell said land for $15 an acre, represented by vendor's lien notes subject to the farm loan, in addition to an assumption of the farm loan indebtedness. It would be wholly immaterial with the purchaser whether he made such notes payable to Cozart or to another designated by Cozart. Cozart could have those notes paid to the Abilene Bank, or to any other person, and the validity of the indebtedness, if any, constituting the reason for having them made so payable would be wholly immaterial. It might be a debt barred by limitation. It could be a mere moral obligation, not enforceable in law. It could be because of favors received or expected, and, in my opinion, it would be wholly immaterial that the reason may have been that the Abilene Bank had found it necessary to incur so great a loss by discharging the former notes in order to get a loan.

Under the allegations of plaintiff's pleadings, by which certainly he is bound, the Abilene Bank was wholly blameless in the matter; and never at any time had any intention of requiring the revival of the indebtedness which it had discharged and released. Briley was only the agent of the bank in the essential transaction of conveying the land to Cozart and/or Oldham, and seeing that the required consideration demanded by the bank was paid

to it. If the bank were entirely blameless, then there is absolutely no warrant for saying that the notes in suit were in any sense a reacknowledgment of the formerly existing but discharged and released indebtedness. The notes in suit, under the undisputed evidence of the plaintiff himself, represent the agreed purchase price of the land by Oldham at $15 per acre, less the amount of the Federal Land Bank and Commissioner's loans assumed by Oldham as the remainder of such consideration.

Oldham as a witness said that if he had known that the Land Bank had required that the excess indebtedness over the amount of the loan be discharged, he would not have executed the notes. If so, he would not have gotten the land. When he comes into a court of equity asking for the cancellation of these notes, he does not offer back the land, and he is forced to acknowledge on the witness stand that these notes represent not the indebtedness which was required to be discharged and released, but a part of what he had agreed to pay as the purchase money of the land, and which, of course, was a condition upon which the land was conveyed to him. It is worth repeating: There is no evidence that Cozart executed to the Abilene Bank any notes in lieu of the notes released and discharged; and no evidence that he ever agreed to do so, or that any demand was made upon him to do so. The only notes he ever agreed to execute he did execute, a part of which was transferred to the Federal Land Bank and Commissioner, and the rest released and discharged. While Briley, as a witness, testified that Oldham agreed to assume the obligations of Cozart, that testimony calls for interpretation. What were the obligations of Cozart? In agreeing to assume the obligations of Cozart it is not to be implied,—particularly when such implication is not necessary and would involve something illegal,—that he agreed to pay debts that were discharged and paid. They were no longer obligations. It seems clear to me that the obligation which Oldham took upon himself was to assume the indebtedness represented by the loan from the Federal Land Bank and Commissioner and to execute notes for the balance of the purchase price of $15 per acre. In a sense that was assuming the obligation of Cozart, but only in the sense that it was an obligation very similar to that originally assumed by Cozart.

From these considerations it seems to me the learned trial judge reached the proper conclusion and that his judgment should be affirmed.